Roger Wayne **COLEMAN**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 01–90–00702–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

June 4, 1992.

Douglas M. O'Brien, Houston, for appellant.

John B. Holmes, Timothy G. Taft, Mara Larson, Houston, for appellee.

Before MIRABAL, DUGGAN and WILSON, JJ.

## OPINION

MIRABAL, Justice.

A jury found appellant, Roger Wayne Coleman, guilty of burglary with intent to commit aggravated assault, and assessed punishment at 15–years confinement and a $5000 fine.

In his sole point of error, appellant asserts the evidence is insufficient to sustain his conviction.

When reviewing the sufficiency of the evidence to support a conviction, the evidence is viewed in the light most favorable to the judgment. *Flournoy v. State,* 668 S.W.2d 380, 383 (Tex.Crim.App.1984). The critical inquiry is whether, after viewing the entire body of evidence in the light most favorable to the judgment, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see also Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986), *cert. denied,* 488 U.S. 872, 109 S.Ct. 190, 102 L.Ed.2d 159 (1988). Proof that amounts only to a strong suspicion or mere probability is insufficient to support a conviction. *Moore v. State,* 640 S.W.2d 300, 302 (Tex. Crim.App.1982).

The State's evidence included testimony from the complainant, Janice Coleman, appellant's estranged wife; her boyfriend, Randy Odell Williams; police officer Russell Herrera; and police sergeant Alberto Espinoza. The complainant's medical records, appellant's tape-recorded statements to 911, and appellant's written statement to the police, also were introduced into evidence. Appellant did not testify until the punishment phase of the trial.

Janice Coleman testified she and appellant were married May 4, 1985, and she filed for divorce in August of 1988. Appellant went to Tennessee, returned to Houston, and resided with Janice when he came back from Tennessee, but Janice did not want a reconciliation. Janice moved from the house they had lived in to a house in Pasadena, and then into the apartment where she was living at the time of the incident. Her apartment lease was introduced into evidence as State's exhibit number 1. Appellant's name was not on the lease nor was he listed among the occupants. Appellant did not have a key to the apartment.

On the night of November 3, 1989, Randy Williams, the man Janice had been dating for more than nine months, spent the night at her apartment. Janice said she and Randy "socialized" with a friend until 10:00 or 11:00 p.m., went to see other friends, and returned to the apartment around 1:00 a.m. They had been drinking, and they went to bed as soon as they got home. No one was in the apartment other than Janice, Randy, and Janice's daughter. There were two working phones in the apartment, one in the bedroom and one in the dining room.

At 2:30 a.m., Janice awoke to find appellant standing over her with a large kitchen knife in each hand. Appellant pointed one of the knives at Randy, who was awakened by Janice's screaming, and appellant threatened to kill him if he moved. Appellant told Janice to get up and go into the living room to talk with him. As Janice tried to get up, appellant cut her twice on the right arm. He grabbed her by the arms, dragged her out of the bed, down the hallway, and into the living room. He pushed her down onto the sofa, and told her "he was going to fix me where I could never work again." Appellant took her left arm, stretched it out, and began to saw back and forth on her wrist with one of the knives.

Janice fell to the floor and appellant stabbed her leg. Appellant began kicking her in the back, pelvis, face, and ribs. Appellant was wearing cowboy boots, and the kicks left heel prints on her back, and broke her ribs. Pictures of the injuries, taken at the emergency room, were admitted into evidence. Other photographs placed in evidence show: (1) entry by breaking in the dining room window; (2) blood on the bed, where Janice was originally attacked; (3) Janice's purse, the contents dumped on the floor, and the knife used to attack her lying beside the purse; and (4) the condition of the living room after the attack.

Janice was taken to Hermann Hospital's emergency room and remained in the hospital for four days. Her medical records indicated her left wrist had been lacerated, exposing the tendons; her ribs were fractured; and she had lacerations on her right forearm and left buttock, as well as swelling and bruising on various parts of her body. The injury to her wrist required surgery that night, and more would be required in the future.

On cross-examination, Janice said no court order established a separate residence for her and appellant. She said when appellant stayed with her after she had filed for divorce, they had slept together; appellant had visited her at the apartment, as a friend; and appellant stayed overnight at her apartment, when he had no where else to go. She was not certain whether the two knives appellant used came from her kitchen. On redirect, Janice said she was not absolutely certain appellant didn't bring the two knives with him that night. Janice had served appellant with divorce papers but he had destroyed them, and she did not have the money to pursue a contested divorce.

Randy Williams testified he and Janice had been dating since January of 1989 and, on the night of the incident, they had been out dancing until 11:30 or 12:00 o'clock. He was awakened by appellant's hollering at Janice, telling her "wake up, bitch, come in the living room. I want to talk to you and then I'm going to kill you." Appellant told Randy not to get involved or he would get stabbed, too. Appellant was armed with two butcher knives. Randy waited for four or five minutes, got dressed, and went to get the security guard. The guard called the police, and by the time Randy got back to the apartment the police had arrived. Randy saw appellant slash Janice's right arm before she could get out of bed, and, when Randy left the apartment, appellant was kicking her.

Both Randy and Janice testified they had not used any drugs that evening, had never used drugs with each other, and had never used drugs with appellant.

Officer Herrera, a Pasadena police officer, was dispatched to the apartment complex. Herrera was met by Randy Williams, who told him, "he's up there, he's cutting her up." Herrera went up to the apartment, found the door ajar, and saw Janice lying on her side, unclothed and covered with blood. He also saw appellant, speaking with the police dispatcher on the telephone. Appellant had called 911, and told the dispatcher "things had gotten out of hand and that he had hurt his wife." Another phone was lying on the living room floor. It was covered with blood and the phone cord had been cut.

Herrera entered the apartment and drew his weapon. He told appellant to put the phone down and stand up with his hands on his head. Herrera checked appellant for weapons. He said appellant seemed calm and followed his orders. He placed appellant under arrest and seized two knives he found, one on the floor and one on the coffee table beside the sofa. Herrera said the knives were approximately 10 inches long, could be used to inflict death or serious bodily injury, and were deadly weapons. The blades of both knives were covered with blood.

Herrera identified photographs, taken that night, showing the lower portion of appellant's pants, covered in fresh blood. No usable fingerprints were obtained from the knives; both knives had wooden handles. Herrera testified there were numerous bruises on Janice's face, back, and legs. There were also several lacerations on her

left wrist and right hand and forearm that appeared to be defensive wounds. Nothing was wrapped around either of her arms when Herrera arrived.

Sergeant Espinoza, of the Pasadena police department, testified that he was assigned to the case on November 4, 1989. Espinoza first saw appellant at the jail, where he interviewed him. Appellant had been before a magistrate, but Espinoza read appellant his rights again, before the interview began. Appellant gave Espinoza his statement, the statement was typed up, and appellant initialed and signed it. The statement was admitted into evidence without objection. Espinoza said appellant appeared very calm and collected throughout the interview.

Appellant's statement was:

MY NAME IS ROGER WAYNE COLEMAN, I AM A WHITE MALE THIRTY-SIX YEARS OLD. I WAS BORN 2/10/53 IN PADUCUAH, KY. AT THE PRESENT TIME I DO NOT HAVE A RESIDENCE, BUT I STAY AT MOTELS OR WITH FRIENDS. YOU CAN USUALLY FIND ME AT 204 SPOONER IN PASADENA. I USUALLY WORK AS A LOADER FOR STEVADOR COMPANY WHICH LOADS AND UNLOADS SHIPS ALONG THE SHIP CHANNEL. I BEEN DOING THIS FOR APPROXIMATELY 6 MONTHS. YOU CAN GET A HOLD OF ME THROUGH INDUSTRIAL LABOR SERVICE, 121 S. MAIN IN PASADENA TELEPHONE NUMBER IS 475-2020. I RECEIVED A GED DEGREE IN 1972 IN KENTUCKEY. I CAN READ AND WRITE THE ENGLISH LANGUAGE VERY WELL.

THIS STATEMENT IS MY STORY AS TO WHAT HAPPENED LAST NIGHT BETWEEN MY WIFE, JANICE COLEMAN AND ME LAST NIGHT.

I HAVE LOOKING FOR MY WIFE FOR A COUPLE OF DAYS BUT NO ONE WAS ANSWERING HER TELEPHONE OR DOOR WHEN I KNOCKED. WE HAVE BEEN SEPARATED FOR APPROXIMATELY ONE YEAR ON AND OFF. SINCE JANICE HAS HAD PROBLEMS WITH DRUGS IN THE PAST I THOUGHT IT WAS POSSIBLE SHE HAD OVERDOSED. SO AFTER I HAD BEEN OUT DRINKING A FEW BEERS I WANTED TO CHECK ON JANICE. SO I GOT RIDE FROM A PASADENA TAXI (# 180) AND GOT RIDE TO JANICE'S APARTMENT. I TRIED KNOCKING ON DOOR, CALLING HER BY PHONE, THROWING LITTLE ROCKS AT HER WINDOWS, AND NO ONE ANSWERED. I KNEW SHE [was home] (handwritten in) 'CAUSE HER CAR WAS IN THE PARKING LOT. SO I KNOCKED A WINDOW PANE BY THE FRONT DOOR, SO I CRAWLED THROUGH. I WENT TO THE BEDROOM AND SAW JANICE IN BED NAKED WITH ANOTHER MAN WHO I KNEW AS RANDY, A LOCAL DRUG DEALER. I KNOW THIS BECAUSE I HAVE PERSONALLY BOUGHT FROM HIM AND USED WITH HIM COCAINE. I HAVE ALSO SEEN PICTURES OF THIS GUY RECEIVING MY CHRISTMAS PRESENTS LAST YEAR, SO I KNEW WHO THIS GUY WAS. I TRIED TO WAKE THEM UP BUT THEY WOULDN'T WAKE UP. SO I WENT INTO THE KITCHEN TO GET A KITCHEN KNIFE BECAUSE I DIDN'T KNOW WHAT THE BOYFRIEND'S REACTION WOULD BE. I KNOW OF CASE WHERE JANICE'S BROTHER HAD WOKE UP A DRUG DEALER AND THE DRUGGIE SHOT AND KILLED JANICE'S BROTHER. SO I FINALLY WOKE JANICE UP. JANICE STARTED SCREAMING AND HOLLERING AT ME TELLING ME I HAD NO RIGHT OF BEING THERE. THATS WHEN I THINK JANICE [saw] (handwritten in) THE KNIFE AND GRABBED AT IT APPARENTLY CUTTING HER WRIST. WE STRUGGLED FOR A BIT BUT I FINALLY GOT HER INTO THE LIVING ROOM. I SAW THAT SHE WAS BLEEDING AND WRESTLED HER TO THE FLOOR SO I COULD SEE HOW BAD SHE WAS HURT. AFTER I SAW THE SEVERITY OF THE CUT I WENT TO THE

BEDROOM AND GRABBED A SHIRT AND WRAPPED JANICE'S WRIST. I THEN TELEPHONED AND REPORTED WHAT HAD HAPPENED. I STAYED ON THE PHONE UNTIL THE POLICE GOT TO THE [apt.] (handwritten in).

SINCE I HAD BEEN DRINKING THAT EVENING PRETTY HEAVILY THERE ARE ALOT THINGS I CAN'T REMEMBER REAL CLEAR, BUT I HAVE GIVEN YOU MY SIDE OF WHAT HAPPENED TO THE BEST OF MY KNOWLEDGE.

A tape recording of appellant's conversation with the 911 dispatcher also was played for the jury.

The State rested, and appellant moved for an instructed verdict on the basis of insufficient evidence of appellant's intent at the time he entered the apartment. The motion was denied, and appellant rested. While the charge was being prepared, the appellant reasserted his motion for instructed verdict, arguing there was no evidence of the specific intent to commit the serious bodily injury required for aggravated assault. The motion again was denied.

The charge to the jury contained the lesser included offense of trespass of a habitation. The trial judge read the charge to the jury, closing arguments were made, and the jury was adjourned for deliberations at 3:30 p.m. At 3:40 p.m., the jury returned a verdict of guilty. The jury also returned an affirmative finding on the special issue on use of a deadly weapon.

The indictment charged appellant with burglary of a habitation with intent to commit aggravated assault. Section 30.02(a) of the Texas Penal Code, the burglary statute, provides:

(a) A person commits an offense if, without the effective consent of the owner, he:

(1) enters a habitation, or a building (or any portion of a building) not then open to the public, with intent to commit a felony or theft; or

(2) remains concealed, with intent to commit a felony or theft, in a building or habitation; or

(3) enters a building or habitation and commits or attempts to commit a felony or theft.

Tex.Penal Code Ann. § 30.02(a) (Vernon 1989). The indictment specifically charged appellant with burglary under section (1), and the jury was so charged.

Appellant concedes the evidence presented would have been sufficient had he been charged under § 30.02(a)(3), but the indictment specifically alleged the element of intent required for § 30.02(a)(1). Count one of the indictment charged that appellant, "with intent to commit aggravated assault, enter[ed] a habitation owned by JANICE COLEMAN, a person having a greater right to possession of the habitation than the [appellant] and hereafter styled the Complainant, without the effective consent of the Complainant, namely without consent of any kind." Appellant asserts the State failed to prove he entered the habitation with the intent to commit aggravated assault; that his statement establishes, at the time he entered the apartment, he did not intend to commit aggravated assault; and that he committed the assault only after he found Janice in bed with Randy.

 Intent, as an essential element of the offense of burglary, must be proved by the State beyond a reasonable doubt; it may not be left simply to speculation and surmise. *LaPoint v. State*, 750 S.W.2d 180, 182 (Tex.Crim.App.1986). The intent to commit a felony or a crime of theft must exist at the time of and accompany the entry into the habitation. *Conrad v. State*, 154 Tex.Crim. 624, 230 S.W.2d 225, 226 (1950). If the intent relied upon by the State is formed after the entry, the crime of burglary has not been shown. *Id.* However, the jury is exclusively empowered to determine the issue of intent, and the events of a burglary may imply the intent with which the burglar entered. *Moreno v. State*, 702 S.W.2d 636, 641 (Tex. Crim.App.1986); *Joseph v. State*, 679 S.W.2d 728, 730 (Tex.App.—Houston [1st Dist.] 1984, no pet.).

The confession of appellant was offered by the State and relied upon by the State. The confession indicates appellant's intent, at the point of entry, was rescue.

Prior to the adoption of rule 607 of the Rules of Criminal Evidence, the rule was that when the State introduced into evidence statements of the accused party, which statements exculpated the accused, and the State did not directly or indirectly disprove them, the accused was entitled to acquittal. *Palafox v. State*, 608 S.W.2d 177, 181–82 (Tex.Crim.App.1979). Where the defendant did not testify in a case, and the State introduced his confession that contained exculpatory statements, the jury had to be charged that the defendant was entitled to a verdict of not guilty unless the exculpatory statements had been disproven or shown to be false by other evidence in the case. *Stills v. State*, 728 S.W.2d 422, 424 (Tex.App.—Eastland 1987, no pet.). Where the exculpatory statements went to an element of the offense, the jury was to be instructed such statements must be disproved beyond a reasonable doubt. *Id.* at 425. This was the "common law voucher rule."

■ Rule 607 states, "The credibility of a witness may be attacked by any party, including the party calling him." Tex. R.Crim.Evid. 607. In *Russeau v. State*, 785 S.W.2d 387, 390 (Tex.Crim.App.1990), the Court of Criminal Appeals held that rule 607 abrogated the voucher rule, and the State is no longer bound by exculpatory statements. Therefore, a jury need not attach equal credit to all parts of a confession; it may accept one portion as true and reject the rest. *Gordon v. State*, 667 S.W.2d 544, 546 (Tex.App.—Beaumont 1983, pet.ref'd).

■ The testimony of Janice and Randy Williams contradicted many of the statements in appellant's confession. Appellant stated he went to the apartment because he was concerned Janice had overdosed on drugs. He said he had telephoned Janice before he broke in, but no one had answered. Janice testified both of her phones were in working order that night, and one was in her bedroom. Appellant stated he

knew Randy Williams was a drug dealer because appellant had personally purchased drugs from him and had used cocaine with him. Yet, both Janice and Randy Williams testified they had never used drugs with appellant, and they had never used drugs with each other. Janice did admit she had used drugs before she met appellant, but not since then.

Further, in his statement appellant said Janice grabbed at the knife, cutting herself. His version of how the wounds were inflicted and what he did substantially differs from the physical evidence and the testimony of Janice and Randy. The jury could have reasonably discounted appellant's whole statement as being incredible and unbelievable.

Additionally, the evidence showed appellant and Janice had been separated for approximately one year, and Janice had been dating Randy Williams for more than nine months. The jury could have reasonably concluded that it was unlikely the fact appellant found Randy at the apartment was such an unexpected occurrence that it caused appellant's violent reaction.

Considering the violence of the attack, considering the fact the jury could have reasonably believed appellant lied about his motivations for entering the apartment in the statement he gave the police, and considering the circumstances of the relationships among appellant and Janice and Randy Williams, we hold the jury could have reasonably concluded from the evidence that appellant had the requisite intent when he entered the apartment.

The dissent is correct that the jury could not properly find the requisite intent "purely on the basis of its disbelief of the accused's contrary assertions." *Gold v. State*, 736 S.W.2d 685, 689 (Tex.Crim.App. 1987). We find the evidence, separate and apart from appellant's written statement, is sufficient to support the jury's findings, beyond a reasonable doubt, that when appellant entered the apartment he had (1) the intent to threaten someone with imminent bodily injury using a deadly weapon, or (2) the intent to cause bodily injury by

using a deadly weapon, or (3) the intent to cause serious bodily injury in some way.

The following excerpt from the State's closing argument to the jury casts the evidence relevant to appellant's intent in the light most favorable to the State:

[By Prosecutor]: You are free to look at all of the actions and the facts and circumstances surrounding what happened out there on November 4, 1989. The Defense counsel keeps telling you that you have nothing [on which] to base the defendant's intent, that for all we know he could have been in there, just wanted to talk. Now, come on, ladies and gentlemen, is that reasonable? Is that what reasonable people do in Harris County, Texas? No. And that's not what happened out there at all. I submit to you that what happened is the defendant has known about Randy Williams and Janice Coleman's relationship for some time and that he had a little too much to drink and started thinking about it and the more he thought about it, the madder he got, and you can listen to that tape, and you can tell. Who does he want to talk to, ladies and gentlemen? He doesn't want to talk to the woman officer. He wants to talk to a man officer. He wants to talk to another man who has maybe found his wife in bed with somebody else. Well, this isn't even his wife any more, ladies and gentlemen. He had no right to be out there. Defense counsel wants you to think that he had no intent when he broke through that window to do what he did. Well, if he didn't have the intent to assault Janice Coleman, then where did all this blood come from? And why doesn't Randy Williams have a scratch on him if he broke into that house to assault Randy Williams? Okay. Randy Williams didn't get a scratch on him. Janice Coleman laying there bleeding to death. No intent, ladies and gentlemen?

Think about what happened out there. The defendant went to the kitchen, if you want to believe that story, first, and got not one knife, but two. He's just going to talk? Ms. Coleman told you she is not even sure that these are her knives.

Well, Mr. Williams [the boyfriend] didn't bring them with him. No intent?

Ladies and gentlemen, think about the phone cords. How did the phone cord get cut and why would the phone cord get cut if you don't have the intent to go in there and commit aggravated assault? Think about it. It doesn't make sense.

Then I want you to think about what exactly was it he did do. He didn't just come up and strike her on the chin. He stabbed her. Look at the medical records. He sawed on her arm back and forth, back and forth, with one of these knives. Ladies and gentlemen, is that simple assault? Not in Harris County, Texas it's not. Did all this blood and all of these bruises come from simple assault? No.

And if you have any doubt at all, ladies and gentlemen, then just take a look at the defendant's own boots. He kicked her so hard that her blood is all over his feet. And these feet walked in with him. These feet walked in with the defendant. He didn't pick them up once he got in there. He was kicking her and beating her. No intent? That's ridiculous.

We overrule appellant's point of error.

We affirm the judgment.

WILSON, J., dissents.

WILSON, Justice, dissenting.

Appellant readily concedes that if the State had charged him with burglary under TEX.PENAL CODE ANN. § 30.02(a)(3) (Vernon 1989), rather than (a)(1), the evidence would have been sufficient to affirm his conviction. I respectfully dissent because I agree with appellant's contention that the evidence is insufficient to support his conviction under the "burglary with intent to commit a felony" section.

There is no question appellant's estranged wife was the victim of a brutal crime committed in her apartment by appellant's hand on the night of November 3, 1989. The only issue in the case is whether a rational factfinder could believe beyond a reasonable doubt from the evidence, viewed

in a light most favorable to the judgment, that appellant unlawfully entered the victim's home with the specific intent to commit an aggravated assault.

The case would be less difficult to analyze if the majority would state more clearly what specific evidence is sufficient to prove appellant's intent independent of appellant's confession, and/or the recordings made by the police of appellant's 911 call the night of the crime. The State's evidence can be divided easily into two parts: (a) what came from appellant, the confession and the recordings; and (b) all other evidence.

While discussing the confession and the recordings, the majority discusses the abrogation of the voucher rule. This analysis is correct as far as it goes, but I respectfully suggest that it is not relevant to the question at issue because it ignores the law of *Gold v. State*, 736 S.W.2d 685, 689 (Tex. Crim.App.1987), in which the court stated, "a factfinder may not find facts necessary to establish an element of a criminal offense purely on the basis of its disbelief of the accused's contrary assertions."

The State no longer has the burden of disproving exculpatory parts of a defendant's confession it introduces. However, this rule does not excuse the State from its burden of proof. "The State has the burden of going forward with evidence to show, and of persuading the factfinder beyond a reasonable doubt of every element of the offense." *Gold*, 736 S.W.2d at 689.

In this case the State advanced a theory to explain the facts at odds with appellant's statements introduced by the State. Although the State was responsible for putting into evidence exculpatory evidence given by appellant, the State no longer has to disprove the exculpatory parts to get a conviction (abrogation of the voucher rule). It is also true that the jury is permitted to disbelieve the exculpatory statements of appellant's statements if it wishes. But a jury's inferred disbelief of the exculpatory evidence is not to be used as affirmative evidence of proving the State's theory. It is the lack of application to the facts of this case of this final principle, as elaborated in

*Gold*, in which I respectfully disagree with the majority.

The majority states the following in reaching its conclusion:

The testimony of Janice and Randy Williams contradicted many of the statements in appellant's confession. Appellant stated he went to the apartment because he was concerned Janice had overdosed on drugs. He said he had telephoned Janice before he broke in, but no one had answered. Janice testified both of her phones were in working order that night, and one was in her bedroom. Appellant stated he knew Randy Williams was a drug dealer because appellant had personally purchased drugs from him and had used cocaine with him. Yet, both Janice and Randy Williams testified they had never used drugs with appellant, and they had never used drugs with each other. Janice did admit she had used drugs before she met appellant, but not since then.

Further, in his statement appellant said Janice grabbed at the knife, cutting herself. His version of how the wounds were inflicted and what he did substantially differs from the physical evidence and the testimony of Janice and Randy. The jury could have reasonably discounted appellant's whole statement as being incredible and unbelievable.

Additionally, the evidence showed appellant and Janice had been separated for approximately one year, and Janice had been dating Randy Williams for over nine months. The jury could have reasonably concluded that it was unlikely the fact appellant found Randy at the apartment was such an unexpected occurrence that it caused appellant's violent reaction.

Considering the violence of the attack, considering the fact the jury could have reasonably believed appellant lied about his motivations for entering the apartment in the statement he gave the police, and considering the circumstances of the relationships among appellant and Janice and Randy Williams, we hold the jury could have reasonably concluded from

the evidence that appellant had the requisite intent when he entered the apartment.

The bulk of the facts cited by the majority as supportive of the jury's verdict runs afoul of *Gold*. What evidence remains after excluding all of the conclusions reached by the majority based on the disbelief of appellant's statements is insufficient to sustain the State's burden. Granting to the majority that there is some evidence to show what appellant's intent was from the State's other evidence, I cannot find a rational factfinder would be convinced beyond a reasonable doubt that when appellant entered the apartment, he was intent on committing aggravated assault.

I do not find in the majority's opinion a specific fact, or group of facts when considered together, and in a light most favorable to the judgment, that directly proves appellant's intent when he entered the premises on that night. Nor do I find a fact, or group of facts when considered together, upon which a jury could rationally conclude by inference and beyond a reasonable doubt that appellant was bent upon committing aggravated assault when entering the apartment.

Nothing in the prosecutor's argument quoted by the majority sheds light on this deficiency. The jury may rationally infer from facts, but it cannot presume in this case the requisite intent from the violence of the attack, from appellant's lying in his statement, or from the circumstances of the relationships. The brutality of the assault is no proof in itself of why appellant entered the apartment on that night. Making inferences based on the premise appellant lied in his statements runs afoul of *Gold*, and nothing in the evidence relative to the relationships of the parties proves appellant came that night for the purpose of doing what he did. The record is silent on any history of violence, or threats of violence between appellant, his wife, and/or Mr. Williams.

The issue of where the knives came from is illustrative of the failure of proof. In its opinion, the majority makes the following reference to the knives:

She (Janice) was not certain whether the two knives appellant used came from her kitchen. On redirect, Janice said she was not absolutely certain appellant didn't bring the two knives with him that night.

The majority later states that a certain excerpt from the State's closing argument casts the evidence relevant to appellant's intent in the light most favorable to the State. On the issue of the knives, the prosecutor stated as quoted by the majority:

Think about what happened out there. The defendant went to the kitchen, if you want to believe that story, first, and got not one knife, but two. He's just going to talk? Ms. Coleman told you she is not even sure that these are her knives. Well, Mr. Williams didn't bring them with him. No intent?

The testimony at trial about the knives reveals, first from cross-examination of Ms. Coleman:

Q: Those knives that are laying there in front of you on the court reporter's table that are marked State's Exhibits 8 and 9 that you previously identified—

A. Yes, sir.

Q. Those are your knives, aren't they?

A. Yes, sir.

Q. And you had seen them earlier that evening in your kitchen I guess?

A. No, sir, actually I hadn't. My mother had given me a sack of knives earlier that day. I had never taken them out of the sack, and I did not see those knives earlier that day.

Q. Where was the sack of knives?

A. In a drawer in the kitchen.

Q. These are two of the knives though?

A. As far as I know, sir. I really don't—I can't testify to that without doubt because I had never seen the knives.

Later the prosecutor returned to the subject of the ownership of the knives in a single, unobjected to leading question:

Q. Ms. Coleman, as far as the knives are concerned, you are not absolutely certain that the defendant didn't bring them with him that night, are you?

A. No, ma'am, I'm not.

I cannot find from this evidence, even considered in the light most favorable to the judgment, that a rational factfinder could conclude *beyond a reasonable doubt* that appellant brought the knives with him on the evening in question, and illegally entered the apartment with the intent to commit the specific crime of aggravated assault as required by the court's charge. The charge stated:

> In this case, the indictment has charged that the entry was made with intent to commit the crime of aggravated assault, a felony, therefore, before you would be warranted in finding the defendant guilty of burglary of a habitation with intent to commit aggravated assault, you must be satisfied from the evidence beyond a reasonable doubt that the entry, if any, in the habitation was made with the intent to commit the *specific* crime of aggravated assault.

(Emphasis added.)

It is, of course, possible for appellant to have entered the apartment without the knives but with the intent to commit aggravated assault. However, the majority does not point to evidence that supports such a theory, nor does the State's argument quoted at length by the majority indicate the case was tried on such a premise.

Because the State has failed to prove the allegations of the indictment beyond a reasonable doubt, even considering the evidence in the light most favorable to support the verdict, we should order the appellant acquitted, however reluctantly.

DUGGAN and MIRABAL, JJ., also participating.