Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS



)
 

KALIF WILLIAMS,
)
 No. 08-02-00310-CR

)


 Appellant,
)
 Appeal from

)
 

v.
)
 346th District Court

)


THE STATE OF TEXAS,
)
 of El Paso County, Texas

)
 

 Appellee.
)
 (TC# 20020D01419)


MEMORANDUM OPINION



 Kalif Williams appeals his convictions for assault and burglary of a habitation. The four-count indictment charged Appellant with aggravated assault (Count I) (1) and burglary of a habitation
with intent to commit assault (Counts II, III, and IV). The trial court directed a verdict on two of the
burglary counts. The jury found Appellant guilty of the lesser-included offense of assault and guilty
of the remaining burglary count. The jury assessed punishment at confinement for one year and a
$4,000 fine for the assault and imprisonment for twenty years for the burglary. We affirm.

FACTUAL SUMMARY


 Claudia Quintero met Appellant in high school. They began dating and had a child together
after Quintero graduated. Their son, Anthony, was born on April 21, 2001. Quintero and Appellant
lived together for a while but she moved into her own apartment in October of 2001. The couple
split up after Appellant became involved with another woman.

 On March 21, 2002, Quintero left Anthony at her mother's home and went to the Kings X
bar with two of her friends, Albert Bohn and Juan Rivas. Quintero had gone to high school with
Bohn and she had met Rivas elsewhere. They drank at the Kings X until approximately 10:30 p.m.
and then decided to return to Quintero's apartment. Quintero picked up Anthony and they bought
a twelve-pack of beer before returning to her two-room apartment. Quintero placed Anthony in a
play pen in the living room where he eventually fell asleep. The adults drank for a while and later
smoked marihuana. Quintero insisted that they not smoke marihuana around the baby so they went
into the bedroom and closed the door. When finished, they returned to the living room and
continued to drink beer.

 At approximately 1:45 a.m., Appellant called Quintero on her cell phone. He wanted to
know where the baby was and how he was doing. Quintero told Appellant that Anthony was asleep
and not to call back. In her opinion, Appellant sounded intoxicated. Quintero hung up, but
Appellant immediately called again. He again asked her where the baby was and warned her that
he would come to her apartment. He also told her that he would "kick her ass" if she hung up on him
again. Despite the warning, Quintero hung up and turned off the phone's ringer. Bohn and Rivas
speculated that Appellant might come to the apartment. Approximately two weeks earlier, Appellant
had approached Bohn and told him that he had learned Bohn was "messing around" with Quintero. 
Appellant told Bohn not to date Quintero because "she is the mother of my child." Appellant also
complained that none of them wanted to hang out with him anymore and they were "backstabbing"
him.

 Shortly after the last call from Appellant, Rivas and Bohn left the apartment in order to
purchase cocaine. They were gone only twenty minutes or so and returned with the drug. Each of
them did a line in the bedroom and returned to the living room. Suddenly, they heard a loud
pounding at the apartment door as if someone were trying to kick it open. Fearing the intruder was
Appellant, they left the baby in the living room, went into the bedroom and closed the door. 
Quintero attempted to call 911 but there was an emergency block on the cell phone and the call
would not go through. When they could not lock the bedroom door, they went into the bathroom. 
Although she had a second-floor apartment, Quintero tried to escape through the bathroom window
but it was too small. As they hid in the bathroom, they heard the window by her front door break
and then heard Appellant break open the bedroom door. Rivas and Bohn attempted to lean against
the bathroom door to keep Appellant out, but he eventually forced his way inside. They tried to
restrain Appellant while Quintero was curled up in the tub screaming.

 Appellant fought against both of them and Rivas fled from the bathroom. Bohn hung on to
Appellant and urged him to calm down, but Appellant repeatedly stated, "No, no, I'm going to get
her, I'm going to get her." Appellant managed to free himself from Bohn and began attacking
Quintero. He hurled her headfirst into the wall and then began punching her in the face. Bohn fled
the apartment through the broken window because the door would not open. Bohn caught up to
Rivas and they decided to call the police. Appellant followed them out to the parking lot but they
managed to get away. They hurried to a convenience store and called 911. 

 While Appellant was gone from the apartment, Quintero went into the living room where she
found Anthony screaming and crying. She called her mother and told her what had happened. She
asked her mother to come get Anthony because she believed Appellant was going to kill both of
them. When Appellant returned to the apartment, Quintero asked him why was doing this. He
yelled at her that the baby was crying and then dragged her by the hair into the bedroom. Appellant
kicked and punched Quintero repeatedly.

 One of Quintero's neighbors, Herbert Leonard, heard the commotion and went upstairs to
the apartment. Leonard saw that the picture window had been completely broken out. He looked
through the window and saw Appellant straddling Quintero, who was on the floor. Appellant held
Quintero's head with one hand and was hitting her with his other fist. Leonard could hear the blows
of Appellant's fist and the thud of Quintero's head as it hit the floor. Leonard yelled at Appellant,
"Hey [expletive], if you want to be bad, why don't you come over here and hit me?" Appellant ran
over to Leonard and "growled" at him through the window. Leonard tried to hit Appellant, but
missed. When Appellant came through the broken window, Leonard grabbed Appellant and slung
him into another neighbor who had also walked up to the apartment. Leonard held Appellant in a
choke hold on the ground until the police arrived. 

 The police officers who arrived described Appellant as extremely angry and combative. 
After the police subdued him and as they were walking him to the patrol car, he told Leonard, "I'll
kill you, white boy." Once in the patrol car, Appellant repeatedly banged his head against the
window while screaming and making faces at Leonard. Officer Armando Molina saw that Quintero
was bleeding profusely from her facial injuries and he photographed the injuries before EMS arrived. 
Quintero's face was already badly swollen. Some of the police officers who were on the scene
testified that they had never seen a person beaten as badly as Quintero. In fact, Molina saw a
photograph of Quintero in the apartment and he could not believe it was the same person. An
ambulance took Quintero to a hospital where she was treated for her injuries and later released. 

 Appellant testified at trial and presented a different version of events. He had been thinking
of his son because he turned eleven months old that day, so he decided to call Quintero. He called
her at approximately 1:30 a.m. and she answered the phone. When he asked how Anthony was, she
replied, "Fine." Appellant then heard a laugh in the background which he recognized as Albert
Bohn. Quintero told Appellant that Juan Rivas was also present. Appellant became concerned
because he knew that Bohn and Rivas regularly used drugs. Given the late hour, he was sure they
were using drugs in the child's presence. Appellant had spoken with Bohn two weeks earlier and
told him to stay away from Quintero and keep the drugs away. Quintero told Appellant that they
were "partying" which he understood to mean that they were drinking and doing drugs. Concerned
about Anthony's welfare, Appellant told her that he was coming to pick up his son. Quintero hung
up the phone. Appellant immediately called back but Quintero hung up again. Appellant called a
third time and told her that he was coming to pick up Anthony. Once again, Quintero hung up on
him. 

 Determined to remove his son from the "bad situation," Appellant pulled on his clothes and
walked for fifteen to twenty minutes to Quintero's apartment. When he arrived, Appellant looked
through a gap in the curtain covering the apartment window and saw indications of drug use. He saw
misty smoke in the living room and then the three adults walked out of the bedroom passing a rolled
up dollar bill between them. Appellant banged on the door and told Quintero that he was there to
get Anthony. Quintero told Appellant to leave but he persisted. He became angry when she would
not open the door and he rammed the door with his shoulder. He could not open the door so he
began banging on the window with the intention of getting Quintero to open it. When the window
accidentally broke, Appellant decided to enter the apartment. He first checked on Anthony, who was
in his play pen in the living room. He then opened the door to the bedroom. Appellant denied
kicking the door open but he could not explain why the photographs showed that the door had been
broken. Quintero, Rivas, and Bohn had gone into the bathroom so Appellant began banging on the
door and asking them to open it. When they refused, he became angry and forced it open. 

 Appellant attempted to hit Rivas, but both Quintero and Bohn restrained him. Rivas fled
from the apartment. He struggled with Bohn as Quintero still attempted to restrain him. Appellant
threw Quintero aside and Bohn ran out of the apartment. Appellant ran after them but returned to
the apartment with the intention of taking Anthony. He picked up Anthony and his diaper bag, but
began arguing with Quintero. When Quintero grabbed him and scratched his neck, he put Anthony
back down and started fighting with Quintero. Appellant admitted hitting and kicking Quintero but
denied entering the apartment with the intent to assault anyone. He disputed Herbert Leonard's
testimony. According to Appellant, Leonard arrived at the apartment after the assault and as
Appellant was leaving. Appellant was talking to another neighbor who was attempting to calm him
down when Leonard placed him in a chokehold.

JURY CHARGE


 In Issue One, Appellant contends that the jury charge contained an incorrect definition of
burglary which authorized the jury to convict based on a theory not alleged in the indictment. When
reviewing charge error, we employ a two-step analysis. Washington v. State, 930 S.W.2d 695, 698
(Tex.App.--El Paso 1996, no pet.). We must first determine whether error actually exists in the
charge. Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984); Washington, 930 S.W.2d
at 698. In making this determination, we view the charge as a whole and our review is not limited
to a series of isolated statements or portions of the charge standing alone. Washington, 930 S.W.2d
at 698; see Holley v. State, 766 S.W.2d 254, 256 (Tex.Crim.App. 1989). Second, we must determine
whether sufficient harm resulted from the error so as to require reversal. Almanza, 686 S.W.2d at
171; Washington, 930 S.W.2d at 698. Which harmless error standard applies depends upon whether
the defendant objected. Abdnor v. State, 871 S.W.2d 726, 731-32 (Tex.Crim.App. 1994);
Washington, 930 S.W.2d at 698. In a case where the defendant failed to object, he must show that
he suffered actual egregious harm. Almanza, 686 S.W.2d at 171; Washington, 930 S.W.2d at 698. 
Where there has been a timely objection made at trial, as in the instant case, an appellate court will
search only for "some harm." Abdnor, 871 S.W.2d at 732; Almanza, 686 S.W.2d at 171. Under
Almanza, we examine the error in light of (1) the entire jury charge, (2) the state of the evidence,
including the contested issues and the weight of the probative evidence, (3) the arguments of
counsel, and (4) any other relevant information. Almanza, 686 S.W.2d at 171.

 Count II of the indictment alleged that Appellant did then and there:

 [I]ntentionally and knowingly, without the effective consent of CLAUDIA
QUINTERO, the owner, enter a habitation with intent to commit assault.


In the abstract definition of burglary of a habitation, the court instructed the jury as follows:


 Our law provides that a person commits the offense of burglary of habitation if,
without the effective consent of the owner, he enters a habitation and commits or
attempts to commit an assault. 


Appellant objected to the definition because it did not comport with the indictment. The trial court
overruled that objection. The application paragraph, however, correctly charged the jury as follows:

 Now, if you find from the evidence beyond a reasonable doubt that the defendant,
Kalif Williams, on or about the 21st day of March, 2002, in the County of El Paso,
State of Texas, did then and there intentionally or knowingly, without the effective
consent of Claudia Quintero, the owner, enter a habitation with intent to commit
assault, then you will find defendant guilty of Count II - Burglary of Habitation. 


 A person commits burglary of a habitation if, without the effective consent of the owner, the
person:

 (1) enters a habitation with intent to commit a felony, theft, or assault;


 (2) remains concealed in a habitation, with intent to commit a felony, theft, or assault; or


 (3) enters a habitation and commits or attempts to commit a felony, theft, or assault.


Tex.Penal Code Ann. § 30.02(a)(1), (2), (3)(Vernon 2003). The indictment here charged
Appellant with the type of burglary alleged in Section 30.02(a)(1). The trial court incorrectly
included the third definition of burglary found in Section 30.02(a)(3). The State admits that the
abstract definition is erroneous but urges that there is no harm because the application paragraph
authorized conviction based solely on the "enter with intent" allegations contained in the indictment
and the arguments of the parties effectively limited any confusion which may have occurred as a
result of the error. We agree. It is the application paragraph alone which authorizes the jury to act. 
See Hutch v. State, 922 S.W.2d 166, 172 (Tex.Crim.App. 1996); Jones v. State, 815 S.W.2d 667,
669 (Tex.Crim.App. 1991). The inclusion of an erroneous abstract definition does not present
reversible error so long as the application paragraph properly limits the jury's deliberations to the
allegations in the indictment. See Hughes v. State, 897 S.W.2d 285, 297 (Tex.Crim.App. 1994)(no
error in giving superfluous abstract instruction on causation when the issue of causation was not
incorporated into the application paragraph); Lewis v. State, 815 S.W.2d 560, 562 (Tex.Crim.App.
1991)(no error in giving superfluous abstract instruction on transferred intent when the issue of
transferred intent was not incorporated into the application paragraph). During final argument, the
attorneys for both parties informed the jury that in order to convict, the evidence had to prove that
Appellant intended to commit an assault at the time of entry. We conclude that Appellant was not
harmed by the incorrect definition given that the application paragraph properly authorized
conviction on the allegations in the indictment. See Lopez v. State, 632 S.W.2d 709, 710 (Tex.App.--Fort Worth 1982, no pet.)(abstract definition of burglary did not comport with type of burglary
alleged in indictment, but application paragraph only authorized conviction based on allegations in
the indictment; therefore, no reversible error shown). Issue One is overruled.

EFFECTIVE ASSISTANCE OF COUNSEL


 In Issues Two and Three, Appellant argues that he was denied the effective assistance of
counsel at trial. Issue Two is limited to a complaint regarding counsel's failure to request a lesser
included offense while Issue Three pertains to counsel's overall performance.

Standard of Review


 The proper standard for determining claims of ineffective assistance under the Sixth
Amendment is the two-step analysis adopted by the United States Supreme Court in Strickland v.
Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Hernandez v. State, 988
S.W.2d 770, 771-72 (Tex.Crim.App. 1999). Under the first prong, the defendant must show that
counsel's performance was deficient, to the extent that counsel failed to function as the "counsel"
guaranteed by the Sixth Amendment. Jackson v. State, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).
The defendant must demonstrate that his attorney's representation fell below an objective standard
of reasonableness under prevailing professional norms. Vasquez v. State, 830 S.W.2d 948, 949
(Tex.Crim.App. 1992). Under the second prong, the defendant must establish that counsel's
deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064, 80
L.Ed.2d at 693; Jackson, 877 S.W.2d at 771. Prejudice is established by a showing that there is a
reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would
have been different. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Jackson, 877
S.W.2d at 771; Hernandez v. State, 726 S.W.2d 53, 55 (Tex.Crim.App. 1986). A reasonable
probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Jackson, 877 S.W.2d at 771. Under the Strickland test,
the appellant bears the burden of proving ineffective assistance by a preponderance of the evidence. 
Jackson, 877 S.W.2d at 771; Calderon v. State, 950 S.W.2d 121, 126 (Tex.App.--El Paso 1997, no
pet.).

 When we review a claim of ineffective assistance of trial counsel, we must indulge a strong
presumption that counsel's conduct falls within the wide range of reasonable, professional assistance
and the appellant must overcome the presumption that the challenged conduct can be considered
sound trial strategy. Jackson, 877 S.W.2d at 771; Calderon, 950 S.W.2d at 126. Under normal
circumstances, the record on direct appeal will not be sufficient to show that counsel's representation
was so deficient and so lacking in tactical or strategic decision-making as to overcome the
presumption that counsel's conduct was reasonable and professional. See Mitchell v. State, 68
S.W.3d 640, 642 (Tex.Crim.App. 2002); Thompson v. State, 9 S.W.3d 808, 814 (Tex.Crim.App.
1999). An appellant challenging trial counsel's performance therefore faces a difficult burden and
"a substantial risk of failure." See Thompson, 9 S.W.3d at 813.

Lesser Included Offense


 Appellant first argues that counsel should have requested that the jury be instructed on the
lesser-included offense of criminal trespass. To determine whether he was entitled to a charge on
the lesser-included offense, we apply a two-pronged test. Rousseau v. State, 855 S.W.2d 666, 672
(Tex.Crim.App. 1993); Avila v. State, 954 S.W.2d 830, 842 (Tex.App.--El Paso 1997, pet. ref'd).
First, the lesser-included offense must be included within the proof necessary to establish the offense
charged. Rousseau, 855 S.W.2d at 672; Avila, 954 S.W.2d at 842. Second, there must be some
evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he
is guilty only of the lesser offense. Rousseau, 855 S.W.2d at 672; Avila, 954 S.W.2d at 842. The
credibility of the evidence and whether it conflicts with other evidence or is controverted may not
be considered in determining whether an instruction on a lesser-included offense should be given.
Banda v. State, 890 S.W.2d 42, 60 (Tex.Crim.App. 1994); Avila, 954 S.W.2d at 842. Regardless
of its strength or weakness, if any evidence raises the issue that the defendant was guilty only of the
lesser offense, then the charge must be given. Saunders v. State, 840 S.W.2d 390, 391
(Tex.Crim.App. 1992); Avila, 954 S.W.2d at 842. An accused is guilty only of a lesser-included
offense if there is evidence that affirmatively rebuts or negates an element of the greater offense, or
if the evidence is subject to different interpretations, one of which rebuts or negates the crucial
element. See Ramirez v. State, 976 S.W.2d 219, 227 (Tex.App.--El Paso 1998, pet. ref'd). That the
jury may disbelieve crucial evidence pertaining to the greater offense is not sufficient to warrant the
submission of the lesser-included offense submission to the jury; there must be some evidence
directly germane to the lesser-included offense to warrant such submission. See Skinner v. State, 956
S.W.2d 532, 543 (Tex.Crim.App. 1997).

 Criminal trespass is a lesser-included offense of burglary of a habitation. See Mitchell v.
State, 807 S.W.2d 740, 742 (Tex.Crim.App. 1991). In his testimony, Appellant admitted that he
entered the apartment and assaulted Quintero but asserted that at the time of his entry, his sole intent
was to remove his child from what he believed to be a bad situation. Appellant sought an acquittal
on the basis of this defense. The jury, by its verdict, rejected Appellant's defense. Nevertheless,
Appellant's testimony is sufficient to raise the lesser-included offense of criminal trespass. 
Appellant argues that counsel had nothing to lose by requesting the lesser-included offense. 
Appellate courts have recognized on several occasions that the failure to request a lesser-included
offense can be a valid and reasonable trial strategy. See e.g., Wood v. State, 4 S.W.3d 85, 87
(Tex.App.--Fort Worth 1999, pet. ref'd); Davis v. State, 930 S.W.2d 765, 768 (Tex.App.--Houston
[1st Dist.] 1996, pet. ref'd); Lynn v. State, 860 S.W.2d 599, 604 (Tex.App.--Corpus Christi 1993,
pet. ref'd). The "all or nothing" strategy of forcing the jury to choose between the greater offense
and acquittal without the alternative of a lesser-included offense, is risky but sometimes successful. 
See Lynn, 860 S.W.2d at 603. Appellant bears the burden of rebutting the strong presumption that,
under the circumstances, counsel's decision not to request the instruction was sound trial strategy. 
Wood, 4 S.W.3d at 87. Thus, the accused must provide a record on appeal from which the reviewing
court can determine that trial counsel's performance was not based on sound strategy. Id. at 87-88. 
Because Appellant did not file a motion for new trial raising his ineffective assistance of counsel
claim, the record does not contain any evidence of trial counsel's strategy for failing to request this
instruction. Given the presumption of effectiveness and the great deference we give to decisions
made by defense counsel, the record before us does not demonstrate ineffective assistance. See
Johnson v. State, 68 S.W.3d 644, 655 (Tex.Crim.App. 2002). Issue Two is overruled.

Extraneous Offenses


 Appellant asserts that counsel's failure to object to certain extraneous offenses at trial
constituted deficient performance because the evidence was inadmissible under Tex.R.Evid. 404(b). 
He contends there is no valid trial strategy for allowing the introduction of this evidence. There are
three incidents involved in this complaint.

 First, trial counsel established during cross-examination of Rivas that Appellant knew Rivas
used cocaine. On re-direct, the prosecutor asked Rivas how Appellant had knowledge of his drug
use. Rivas replied, without objection, that he and Appellant had used drugs together more than one
hundred times. Appellant also testified that he knew Rivas had a drug habit.

 Second, trial counsel cross-examined the custodian of Quintero's medical records about
certain statements made by the treating physician and had the witness read some of the doctor's
notes. Counsel did so with the purpose of showing that Quintero's injuries were not serious. In
response, the prosecutor had the witness read other notes made by the doctor, including Quintero's
statement that this was the third time Appellant had assaulted her.

 Finally, in an apparent effort to show that Appellant's hands and feet were not deadly
weapons, trial counsel elicited testimony from Appellant that he did not have martial-arts or boxing
training. The prosecutor subsequently asked Appellant whether he had been in fights before, and
Appellant testified that he had been in countless bar fights with men.

 In reviewing these claims, we keep in mind that an attorney does not have an obligation to
object to admissible evidence. See McFarland v. State, 845 S.W.2d 824, 846 (Tex.Crim.App. 1992),
overruled on other grounds by Bingham v. State, 915 S.W.2d 9 (Tex.Crim.App.1994). Evidence of
extraneous bad acts is admissible to prove intent. Tex.R.Evid. 404(b); Linder v. State, 828 S.W.2d
290, 293-94 (Tex.App.--Houston [1st Dist.] 1992, pet. ref'd)(op. on reh'g)(in burglary prosecution,
extraneous offenses admissible to prove intent at time of entry). The issue of Appellant's intent was
hotly contested at trial. In order to rebut the State's theory of the case, Appellant sought to prove that
he entered the apartment out of concern for his child rather than intent to commit assault. The prior
violent acts were admissible to rebut Appellant's claimed intent and to show that he entered the
apartment with the intent to assault Quintero. Any objection to this evidence would have been futile.

 Extraneous offenses may be admissible where the accused opens the door to their admission. 
See Monkhouse v. State, 861 S.W.2d 473, 476 (Tex.App.--Texarkana 1993, no pet.); Creekmore v.
State, 860 S.W.2d 880, 892 (Tex.App.--San Antonio 1993, pet. ref'd)(op. on reh'g). In order to
explain why he was concerned for his child and entered the apartment, Appellant testified that he
knew Rivas and Bohn used drugs. This opened the door to the State questioning Appellant about
the basis of his knowledge. Counsel had no obligation to object to this evidence. To the extent any
of the extraneous offense evidence was inadmissible, we could speculate about counsel's reasons
for not objecting and the trial strategy involved in the decisions. However, ineffective assistance of
counsel claims are not built upon retrospective speculation. See Bone v. State, 77 S.W.3d 828, 835
(Tex.Crim.App. 2002). They must be firmly founded in the record and that record must itself
affirmatively demonstrate the alleged ineffectiveness. Id. The record before us does not rebut the
presumption of effectiveness. Consequently, Appellant has not carried his burden of establishing
even the first prong of the Strickland standard.

Failure to Request Lesser Included Offense


 In attacking counsel's overall performance, Appellant includes the argument raised in Issue
Two regarding counsel's failure to request a lesser-included offense. This issue has been resolved
adversely to Appellant and further discussion is unnecessary.

Prosecutor's Final Argument/Guilt-Innocence


 During final argument, the prosecutors focused on the severity of Quintero's injuries to show
that Appellant's hand and foot were deadly weapons. (2) Appellant's counsel argued that while the
photographs of the injuries looked bad, the medical records showed that Quintero did not suffer
serious injury. In response, one of the prosecutors argued, without objection, that this was the worst
beating he had seen while serving as a felony prosecutor. Appellant argues that this was improper
personal opinion argument and counsel should have objected. Even assuming Appellant is correct
that the argument was objectionable, the State correctly points out that the jury found Appellant not
guilty of aggravated assault and only found him guilty of assault. Presumably, the jury had a
reasonable doubt whether Appellant's hand and foot were deadly weapons. Under the
circumstances, Appellant cannot show any prejudice resulting from the prosecutor's argument
regarding the severity of Quintero's injuries.

Punishment Phase


 Appellant next complains that counsel should have objected to the prosecutors' arguments
regarding parole. The charge contained the instruction mandated by Article 37.07 § 4(c) of the Texas
Code of Criminal Procedure: (3)

 Under the law applicable in this case, the defendant, if sentenced to a term of
imprisonment, may earn time off the period of incarceration imposed through the
award of good conduct time. Prison authorities may award good conduct time to a
prisoner who exhibits good behavior, diligence in carrying out prison work
assignments, and attempts at rehabilitation. If a prisoner engages in misconduct,
prison authorities may also take away all or part of any good conduct time earned by
the prisoner.


 It is also possible that the length of time for which the defendant will be imprisoned
might be reduced by the award of parole.


 Under the law applicable in this case, if the defendant is sentenced to a term of
imprisonment, he will not become eligible for parole until the actual time served
equals one-fourth of the sentence imposed. Eligibility for parole does not guarantee
that parole will be granted.


 It cannot accurately be predicted how the parole law and good conduct time might
be applied to this defendant if he is sentenced to a term of imprisonment, because the
application of these laws will depend on decisions made by prison and parole
authorities. 


 You may consider the existence of the parole law and good conduct time. However,
you are not to consider the extent to which good conduct time may be awarded to or
forfeited by this particular defendant. You are not to consider the manner in which
the parole law may be applied to this particular defendant. 


 The first prosecutor who addressed the jury reviewed the jury charge, including the parole
instruction. He correctly explained the law regarding parole but went further and told the jury that
if they assessed Appellant's punishment at twenty years, he would be eligible for parole in five years,
and if they assessed punishment at five years, he would be eligible for parole in one year. Defense
counsel did not object but explained during his argument that parole and good-time credit had to be
earned. If a prisoner did not "toe the line" and stay out of fights while in prison, he would serve the
entire term. The second prosecutor argued similarly, explaining that if the jury assessed a twenty-year sentence, Appellant would be eligible for parole in five years less any good-time credit. Citing
Valencia v. State, 966 S.W.2d 188, 190 (Tex.App.--Houston [1st Dist.] 1998, pet. ref'd), Appellant
argues on appeal that the prosecutors improperly invited the jury to apply the parole laws to this case
in violation of the court's instructions.

 As a general rule, prosecutors are permitted to quote, paraphrase, or explain the law
contained in the court's charge unless the prosecutor's statements are inaccurate or contrary to the
charge. See Whiting v. State, 797 S.W.2d 45, 48 (Tex.Crim.App. 1990); Jamramillo Perez v. State,
994 S.W.2d 233, 237 (Tex.App.--Waco 1999, no pet.). This general rule extends to the parole
instruction. Jamramillo Perez, 994 S.W.2d at 237; Taylor v. State, 911 S.W.2d 906, 911 (Tex.App.--Fort Worth 1995, pet. ref'd). Prosecutors are not, however, permitted to apply the parole laws to
the defendant on trial. See Jamramillo Perez, 994 S.W.2d at 237; Taylor, 911 S.W.2d at 911. 

 In Valencia, the prosecutor improperly applied the parole laws to the defendant during final
argument and mistakenly informed the jury that if it sentenced the defendant to forty years, he would
be eligible for parole in as little as two years. Valencia, 966 S.W.2d at 190. Thus, the prosecutor
misstated the law. The court of appeals found that counsel's failure to object could not be justified
under any circumstances. That is not the case here as the prosecutor's correctly summarized the
parole law. Therefore, Valencia is distinguishable.

 As we have noted throughout the discussion of Issues Two and Three, Appellant failed to
present any evidence regarding counsel's reasons for not objecting to the argument. This is not a
case where there can be no valid reason or legal strategy for failing to object. The State suggests one
plausible explanation for counsel's action: counsel may have believed Appellant would benefit from
the prosecutor emphasizing that Appellant would be required to serve one-fourth of his sentence
before becoming eligible for parole as it served to rebut commonly-held beliefs that prisoners
become eligible for parole after serving less than one-fourth of the assessed sentence. Counsel also
seized upon the prosecutor's statements about parole and argued that parole and good-time credit
were not guaranteed. He informed the jury, who heard Appellant testify about being in more than
one-hundred fights, that a prisoner who got into fights could be required to serve his entire sentence. 
Having subtly applied the parole law to Appellant, defense counsel asked the jury to assess
punishment at less than ten years. Under these facts, Appellant has not rebutted the presumption that
counsel's failure to object was reasonable trial strategy.

Counsel's Comments


 Finally, Appellant criticizes counsel for referring to Appellant's actions as "crazy" and
"insane" and for referring to the case as a "lemon." During cross-examination of one of the police
officers, counsel established that the officer would have taken steps to intervene if his own child had
been in the same situation as Appellant's child. When the officer agreed that he would, counsel
asked: "Maybe not crazy insane efforts, but you would make efforts to intervene. Is that correct?" 
The evidence demonstrated that Appellant was, in fact, out of control that evening and more than
one witness characterized his behavior as being like an animal. While counsel could have been more
careful with the phrasing of his question, it is a reasonable trial strategy to acknowledge the
defendant's state of mind and that events got out of control but provide an alternative explanation
for his actions than the one put forth by the State. Further, Appellant does not show how this
isolated comment prejudiced his defense.

 During closing argument at the punishment phase, trial counsel remarked:

 I would like the jury to consider my client's state of mind and look back at the
evidence with regards to the situation of his child on the evening of March 21st. I
know it's impossible to agree with the outcome of what happened, but that is what
happened. And the only explanation we have is that my client was concerned about
his son, and he went over there to retrieve his son, and things just went crazy. Now,
that is perhaps the only argument I've ever had. I mean, when God gives you
lemons, you try to make lemonade, and I don't know if I've done that. The pictures
are horrible, the circumstances are horrible, what was going on that evening was
horrible, so there's really nothing good about any of this.


Counsel did not call the case a lemon. He simply acknowledged that the facts were difficult and that
the jury had not agreed with Appellant's defense. Doing so is not deficient performance.

 Our review of the record reveals that counsel vigorously defended Appellant against the four
charges. He successfully obtained a directed verdict on two of the charges and convinced the jury
to find Appellant guilty of a lesser-included offense of assault. He also convinced the jury to
sentence Appellant to the lower end of the punishment range despite the facts of the case and
Appellant's prior criminal history. While another attorney may have tried the case differently, that
does not amount to ineffective assistance of counsel. Because Appellant has failed to sustain his
burden of establishing ineffective assistance of counsel by a preponderance of the evidence, we
overrule Issue Three.

FACTUAL SUFFICIENCY


 In his final issue for review, Appellant challenges the factual sufficiency of the evidence to
show he entered Quintero's apartment with the intent to commit assault. He argues that because the
evidence does not show the time lapse between his entry and the assault, he made no verbal threats
prior to entering the apartment, and he testified that he did not intend to commit assault when he
entered the apartment, the jury's verdict is against the great weight and preponderance of the
evidence.

Standard of Review and Law Applicable to Intent


 When conducting a review of the factual sufficiency of the evidence, we consider all of the
evidence, both admissible and inadmissible, but we do not view it in the light most favorable to the
verdict. Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App . 1996); Levario v. State, 964 S.W.2d
290, 295 (Tex.App.--El Paso 1997, no pet.). We review the evidence weighed by the jury that tends
to prove the existence of the elemental fact in dispute and compare it with the evidence that tends
to disprove that fact. Johnson v. State, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); Jones v. State, 944
S.W.2d 642, 647 (Tex.Crim.App. 1996). A defendant challenging the factual sufficiency of the
evidence may allege that the evidence is so weak as to be clearly wrong and manifestly unjust, or in
a case where the defendant has offered contrary evidence, he may argue that the finding of guilt is
against the great weight and preponderance of the evidence. See Johnson, 23 S.W.3d at 11.
Although we are authorized to set aside the fact finder's determination under either of these two
circumstances, our review must employ appropriate deference and should not intrude upon the fact
finder's role as the sole judge of the weight and credibility given to any evidence presented at trial. 
See Johnson, 23 S.W.3d at 7. We are not free to reweigh the evidence and set aside a verdict merely
because we feel that a different result is more reasonable. Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997); Clewis, 922 S.W.2d at 135.

 Intent is a fact question for the trier of fact, and it may be inferred from the acts, words, and
conduct of the accused. Manrique v. State, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999); Wallace
v. State, 52 S.W.3d 231, 234 (Tex.App.--El Paso 2001, no pet.). As a result of its nature, mental
culpability must generally be inferred from the circumstances under which a prohibited act or
omission occurs. Hernandez v. State, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991); Wallace, 52
S.W.3d at 235. The intent to commit a felony, assault or theft must exist at the time of and
accompany the entry into the habitation. Coleman v. State, 832 S.W.2d 409, 413 (Tex.App.--Houston [1st Dist.] 1992, pet. ref'd). If the intent relied upon by the State is formed after the entry,
the crime of burglary has not been shown. Id. The jury is exclusively empowered to determine
whether the defendant had the intent to commit assault when he entered the habitation, and the jury
may infer the defendant's intent from the events of the burglary. See Moore v. State, 54 S.W.3d 529,
539 (Tex.App.--Fort Worth 2001, pet. ref'd).

Review of the Evidence


 The State's evidence demonstrated that during the second phone call from Appellant to
Quintero, Appellant told Quintero that if she hung up on him again, he would "kick her ass." 
Quintero hung up on Appellant and he arrived at the apartment shortly thereafter and began pounding
or kicking on the door. Quintero, Bohn, and Rivas ran into the bedroom and then into the bathroom
to hide. Appellant could not force open the apartment door, so he broke a window and entered in
that manner. The witnesses heard Appellant break open the bedroom door and he then began
attempting to force his way into the bathroom. Once in, he immediately began throwing punches
and assaulting all three of them. Appellant did not make verbal threats prior to entering the
apartment but he told Bohn, who attempted to calm and restrain him, that he was "going to get
[Quintero]." Appellant then proceeded to make a vicious and prolonged attack on Quintero,
stopping only to chase Rivas and Bohn after they fled from the apartment. When he could not catch
them, he returned to the apartment and renewed his attack on Quintero. During this second assault,
he called Quintero a "fucking whore." Quintero believed Appellant was jealous of Bohn because
two weeks earlier, Appellant had confronted Bohn about his relationship with her, and Appellant
knew Bohn was present at Quintero's apartment. The evidence showed that Appellant was out of
control and in a state of extreme agitation during the assaults, after the police arrived, and even after
being taken into custody.

 In his testimony, Appellant denied having any intent to commit assault at the time of his
entry. Although he admitted being angry that Quintero would not open the door, he claimed that he
accidentally broke the window by pounding on it. He decided to enter through the broken window
to check on the welfare of his son. He also denied having an intent to assault Quintero when he
entered the apartment the second time but they began arguing when he picked up his child and it
escalated into a physical fight.

 The jury had the task of weighing the evidence, examining the credibility of the witnesses,
and resolving the conflicts in the evidence. The jury could have rejected Appellant's claimed intent
of wanting to remove his son as being unreasonable in light of all the evidence, particularly his prior
warning to Bohn that he should stay away from Quintero, his threat to "kick [Quintero's] ass" if she
hung up the phone, and the degree of aggression and violence exhibited by Appellant once in the
apartment. Even though Appellant had immediate access to his son upon entering the apartment and
nothing prevented him from leaving with his son as Quintero, Bohn, and Rivas were hiding in the
bathroom, Appellant proceeded to break open the bedroom door and force his way into the bathroom
where he immediately began assaulting the occupants. When Appellant's claimed intent is weighed
against the evidence showing the manner of his entry into the apartment, his dogged determination
to gain access to the occupants, and the degree of violence, the jury could have rejected Appellant's
explanation as unreasonable and instead found that he had the requisite intent to commit assault at
the time of his entry into the apartment. See Coleman v. State, 832 S.W.2d 409, 414-15 (Tex.App.--Houston [1st Dist.] 1992, pet. ref'd)(evidence sufficient to prove that defendant had intent to commit
aggravated assault when he entered his estranged wife's apartment even though defendant claimed
in confession that he entered apartment because he believed that his estranged wife may have
overdosed on drugs; defendant had possessed two knives, telephone cord had been cut, and he
engaged in a violent attack on estranged wife after finding her in bed with another man). 
Accordingly, we find the evidence factually sufficient to support the conviction. We overrule Issue
Four and affirm the judgment of the trial court.

February 19, 2004 

 ANN CRAWFORD McCLURE, Justice


Before Panel No. 1

Larsen, McClure, and Chew, JJ.


(Do Not Publish)
1. The indictment alleged in multiple paragraphs that Appellant caused bodily injury to the victim by striking
her head with his hand, kicking her body with his foot, and stomping her body with his foot. The indictment further
alleged that Appellant used a deadly weapon, namely, his hand and foot. 
2. The jury may consider all of the facts in determining whether a weapon is deadly, including the words of the
accused, the intended use of the weapon, the size and shape of the weapon, the testimony of the victim, the severity of
the wounds inflicted, and testimony as to the weapon's potential for deadliness. Bui v. State, 964 S.W.2d 335, 343
(Tex.App.--Texarkana 1998, pet. ref'd); Hicks v. State, 837 S.W.2d 686, 690 (Tex.App.--Houston [1st Dist.] 1992, no
pet). 
3. See Tex.Code Crim.Proc.Ann. art. 37.07 § 4(c)(Vernon Supp. 2003).