

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-09-00017-CR
_____

SCOTT LEROY BROWN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
Smith County, Texas
Trial Court No. 003-84603-06

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss
Dissenting Opinion by Justice Carter

OPINION

The confrontation happened July 14, 2006. Scott Leroy Brown and his wife had been going through a bitter divorce which left hard feelings between Brown and his neighboring in-laws, the Walkers.[1] The events of that evening ultimately resulted in Brown's conviction by a Smith County[2] jury for both burglary of a vehicle and criminal trespass. In this appeal, we review the evidence admitted at trial, review the evidence of the challenged element of the offense under applicable standards, and conclude that both legally and factually sufficient evidence supports Brown's conviction for burglary of a vehicle.[3] *See* TEX. PENAL CODE ANN. § 30.04 (Vernon Supp. 2008).

*(1)     Summary of the Evidence*

*(a)     Robert Walker's testimony*

Robert Walker's daughter and Brown were in the midst of a divorce on Friday, July 14, 2006, a divorce which, according to all accounts, was rather lengthy and contentious. Walker, then sixty-eight "and-a-half" years old, had been serving as a volunteer at his church's prayer service on that Friday and was returning to his home in Hide-A-Way Lake, a gated community, at about 7:15 p.m.

---

[1]As Robert Walker played a more central role in this matter than his wife, Wanda Walker, this opinion will refer to him as Walker. We will refer to Wanda Walker as Wanda.

[2]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Vernon 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[3]In a companion case, *Brown v. State*, cause number 06-09-00018-CR, Justice Moseley addresses the issues raised with respect to Brown's conviction for criminal trespass.

2

On his way home, he met Brown, also a Hide-A-Way Lake resident, driving his white Lexus SUV. According to Walker, when he first saw Brown, Brown drove into Walker's lane and continued, coming straight at him. At the last minute, Brown swerved back into his own lane, and Walker swerved off the road to avoid what he thought to be an impending collision. After the two passed one another, Brown made a U-turn, caught up to Walker, and tailgated him the remainder of the way to the Walker residence.

Walker pulled into his driveway and got out of his truck, and Brown pulled in right behind him, blocking the driveway. Brown got out of his vehicle and began "hollering and cussing and raising cane. [sic]" According to Walker, Brown parked on an easement on the Walker property on which Walker had laid asphalt. Then Brown approached the house on foot. Walker testified that, in response to Brown's cursing, he "did holler back at him," instructing Brown to get off his property. Walker admitted that he was concerned and scared that Brown was there. He testified that he told Brown three times to leave the property, two times before he called the sheriff's department and once after he called the sheriff's department.

The initial confrontation lasted two or three minutes according to Walker. He then informed Brown that he was going in to call the sheriff's department. At that point, Brown walked further up the driveway, pounded the truck's tailgate with his hand, opened the driver's side door of Walker's truck, and took out the .38 revolver that Walker kept in the door's storage compartment.[4] Brown

_____

[4]On cross-examination, Walker testified that he did have a concealed handgun permit.

waved the gun in the air and threatened to kill Walker when the divorce was over. Brown added, "I've got you now," or words to that effect. At that point, Walker hurried inside to call 9-1-1.

As Walker was going inside to call the sheriff's department, Brown waved the gun in the air as he returned all the way back to his own vehicle. Walker finished his call to the sheriff's department, called the gated community's security department, learned from Wanda that Brown had returned the gun to Walker's truck, and came back out the front door. Brown was still standing by his own vehicle and still cursing and yelling obscenities about Walker's daughter. Both the Walkers were outside the house now, yelling at Brown to leave. Walker informed Brown that he had called the authorities and that they were on their way to the Walkers' home. Walker then directed Brown for the third time to leave the property. Brown "cussed a little more and raised a little more cain and said a few more words I'm not going to repeat and got in his vehicle and drove off."

While Walker was inside making the telephone calls, his wife, Wanda, had yelled at Brown to leave the property as well. Walker testified that he had not been aggressive or threatening to Brown either on the roadway or at the Walkers' house. Walker admitted to being loud and vocal once Brown came onto the property, but declined Brown's invitation to come out and fight. Walker filled out reports with the community's security department and with the sheriff's department explaining the sequence of events. Walker described various surgeries he has had and certain physical ailments and testified that he did not want to fight anyone.

4

On cross-examination, Walker explained that he stayed outside only a short time in an attempt to convince Brown to leave the property and return the gun before he went in to call 9-1-1. When repeatedly asked about the exact duration of each stage of this confrontation, Walker admitted some uncertainty: "I'm going to tell you I was so scared and nervous that I don't remember times precise."

*(b)    Wanda Walker's testimony*

Wanda Walker was reading and waiting for her husband to return from church; he was a little late. She heard a commotion coming from outside and initially did not think much of it. She then recognized her husband's voice, heard "hollering," and, concerned that something had happened to her husband, went to the front door. She opened the front door, stood on the stoop, and saw her husband coming up the sidewalk toward the house. She saw Brown and his vehicle as well.

She described Walker as upset and "hollering back and forth with [Brown]." She asked her husband what was going on, to which he replied that Brown had Walker's gun. She saw Brown standing outside his own vehicle, holding up the gun, and saying something to the effect that, "I've got you now." She did not know why he was saying that. As Walker came to the front door, he told his wife to get out of the way, brushed her aside, and stated that he was going in to call the authorities. Wanda backed a little further inside the door at that point, explaining that she was less brave without Walker being out there as well, and then, from a long window near the door, began

5

yelling at Brown to leave the property and leave them alone. According to Wanda, that is when Brown directed insults at her, calling her fat and such. Brown remained on the property.

As Walker called community security and the sheriff's department, Wanda remained at the long window and watched Brown stand by his vehicle with the gun held up for a while and then walk toward Walker's truck. When Walker came back from making the telephone calls, she told him that she thought Brown had returned the gun to the truck, although she did not clearly see him do so because her vision was obstructed by the angle of the house. She did see that Brown no longer had the gun in his hand after he went to Walker's truck and then returned to his own vehicle.

Now that Brown no longer had the gun, both she and Walker stepped outside. Wanda explained that Brown continued saying "vile" things about their daughter and the entire family and that she again told him to leave. Walker told Brown that he had called the authorities and that they were on their way. Brown then got in his vehicle and left. She estimated that five to seven minutes passed from the time she first saw Brown with the gun to the time that he returned the gun. On cross-examination, she testified that she thought the gun was in its holster. She never saw Brown point it at anyone.

*(c)    Deputy Ricky Bell's testimony*

Ricky Bell, with the Smith County Sheriff's Office, was dispatched to investigate the facts surrounding the confrontation between Brown and Walker. After interviewing Walker, Bell drove to Brown's house, where he interviewed him and made a video recording of the interview of Brown.

6

During the recorded interview, which was admitted into evidence, Brown indicated that, during his time at the Walker residence, Brown opened the door to Walker's truck and that, while inside the truck, he "thought about taking" Walker's gun from inside the truck. Brown's explanation of that, on the recorded interview, was that Walker had already fired it and that Brown was concerned about his safety. After a discussion by the State in an effort to show what was required to establish that Brown, while inside the truck, intended to deprive Walker of his gun, Bell was allowed to state that, in Bell's mind—when Brown said he grabbed the gun from inside Walker's truck, thought about taking it, and put it back—that constituted "intent" on Brown's part.

(d) *Brown's testimony*

Brown testified in his own defense that he met Walker as he drove into the back gate of the community and as Brown was exiting the gate. He testified that Walker swerved into his lane and drove off the road and into the grass alongside the road. This angered Brown, so he turned his vehicle around and took some shortcuts to catch back up to Walker. As Walker passed through an intersection where Brown was stopped, Walker waved his hand or his gun at Brown. He testified that Walker had brandished the gun at him in the past. Having caught back up to Walker, Brown continued and followed him to the Walker home. He explained that he did not call the police when Walker waved the gun at him because he had left his cell phone at home on its charger. He testified that, based on his experience in real estate, he believed he did not park on the Walkers' property.

7

He testified that he got out of his vehicle and that he and Walker exchanged words for approximately five minutes about the roadway incident. Wanting to make certain that Walker no longer had possession of the handgun, he went up to the truck to see if the gun was in there. He added that he did not intend to keep the gun; he only wanted to take it and turn it over to law enforcement authorities. He explained that he planned to describe the incident to police and give them the gun, but Walker called 9-1-1 first. After learning that, Brown decided that it would be better to put the gun back. He then testified that he left to go make the telephone call to authorities. He admitted that he was asked to leave. In fact, he admitted that he was asked *twice* to leave before he did so.

On cross-examination, when questioned about the dubious choices he made to follow Walker rather than go home to call police immediately, to remain on the property, and to take the gun from Walker's truck, all when Brown had just had surgery that morning, Brown replied that "[a]nger has a way of making us make decisions that aren't the best." He explained that he only had the gun in his hand for "a second" before putting it back in Walker's truck and that he never left the area of the truck with it. Brown testified that he had to move something out of the way to get the gun out of the door compartment. He reiterated that he just found it, picked it up, and put it back down, only making certain that Walker did not have it.

Brown added that he thought about taking the gun only to protect himself and to give it to law enforcement officials: "I thought about whether I should keep it to protect myself and turn it

over to the police authorities or put it back and I decided to put it back."  Even by Brown's own account, Walker was walking toward the house and not toward Brown and not back toward the truck where the gun was kept.

*(2)    Applicable Law*

*(a)    Standards of review*

When reviewing the legal sufficiency of the evidence, an appellate court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard mandates that the reviewing court accord deference to the fact-finder's duty to resolve conflicts in testimony and other evidence.  *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  This review standard requires an examination of all the evidence, both properly and improperly admitted, to determine whether the cumulative force of all the evidence (direct, circumstantial, or both) supports the verdict when such evidence is viewed in the light most favorable to that verdict.  *Id.*; *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Factual sufficiency review has subtle differences.  "Evidence may be factually insufficient if:  '1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and preponderance of the available evidence.'"  *Berry v. State*, 233 S.W.3d 847, 854 (Tex. Crim. App. 2007) (quoting *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)).  "Such

a factual sufficiency review requires the reviewing court to consider all of the evidence." *Id.* (citing *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)). "A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *Id.* (citing *Sells v. State*, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003); *Santellan v. State*, 939 S.W.2d 155, 165 (Tex. Crim. App. 1997)). Although a factual sufficiency review authorizes an appellate court, to a very limited degree, to act as a "thirteenth juror," the appellate court must nevertheless give the jury's verdict a great degree of deference. *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009) (citing *Watson v. State*, 204 S.W.3d 404, 416–17 (Tex. Crim. App. 2006)).

(b) *Elements of burglary of a vehicle*

A person commits the offense of burglary of a motor vehicle if, without the effective consent of the owner, that person breaks into or enters a vehicle with the intent to commit any felony or theft. TEX. PENAL CODE ANN. § 30.04(a). Brown challenges the evidence only as to the element of intent. Intent to commit theft may be inferred from the circumstances. *Moreno v. State*, 702 S.W.2d 636, 641 (Tex. Crim. App. 1986), *disapproved on other grounds by Hall v. State*, 225 S.W.3d 524 (Tex. Crim. App. 2007); *Simmons v. State*, 590 S.W.2d 137, 138 (Tex. Crim. App. 1979); *Coleman v. State*, 832 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (specific intent to burglarize motor vehicle can be inferred from circumstances).

10

The jury is exclusively empowered to determine the issue of intent, and the events of a burglary may imply the intent with which the burglar entered. *Moreno*, 702 S.W.2d at 641; *Joseph v. State*, 679 S.W.2d 728, 730 (Tex. App.—Houston [1st Dist.] 1984, no pet.). Furthermore, property need not be taken for proof of intent to commit theft to be sufficient. *Ortega v. State*, 626 S.W.2d 746, 749 (Tex. Crim. App. 1981). The element required by Section 30.04 of the Texas Penal Code is intent; "the State is not required to prove any actual taking." *Jones v. State*, 482 S.W.2d 634, 636 (Tex. Crim. App. 1972); *Thomas v. State*, 919 S.W.2d 810, 814 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd).

*(3)    Legally and Factually Sufficient Evidence of Intent to Deprive*

The record contains evidence from which the jury could have inferred the requisite intent to commit theft. Walker testified that Brown walked to the truck, opened the door, and took out the gun. According to Walker, Brown waved that gun in the air while threatening him and stating something to the effect that, "I've got you now." Wanda's testimony confirmed that Brown was waving the gun and stating such; he added that Brown had walked backed to his own vehicle at that point while Walker was inside calling the sheriff's department and community security. A short time later, Brown walked back up the driveway and placed the gun back in Walker's truck. This evidence could have suggested that Brown took the gun from the truck to threaten and taunt the Walkers, to aggravate them, and then reconsidered this course of action on mention of police involvement.

11

Brown offered a number of explanations concerning his intent when he got the gun out of the truck. In one instance, he maintained he had the gun for only a moment and then only to make certain that Walker did not have the gun. His testimony, that he checked the location of the gun because he was afraid of Walker using the gun against him, is inconsistent with the facts and his own description of his thought process in getting the gun. First, it was Brown who came to the Walker residence on his own volition; he could have left as requested. Second, all accounts show that Walker was moving in the direction of the house and did not advance toward the truck, where the gun was, or toward Brown. Nothing in the record suggests that Walker had the gun in his hand at any time after arriving at his house. In both his previous report to the deputy sheriff and in his own trial testimony, Brown admitted that he considered taking the gun. Brown offered that his reasons included self-protection and delivery to police. Brown explained that, after he learned that law enforcement authorities were coming, he thought it better to return the gun. Such a decision would not have been necessary had he picked up the gun only to make certain it was there and immediately replaced it in the storage compartment, as he stated at other times. Ample contrary evidence would permit the jury to reject the self-serving portions of Brown's scenario.

The evidence also undermines the second part of Brown's other explanation concerning his intent to turn Walker's gun over to police. Although Brown does not specifically discuss *Jenschke v. State*, 147 S.W.3d 398 (Tex. Crim. App. 2004), his contention that he took the gun with the intent to turn it over to law enforcement authorities implicates the Texas Court of Criminal Appeals'

12

holding in that case. In *Jenschke*, parents of a child victim of sexual assault, after learning of the assault from their daughter, used a hidden key to gain entry to the suspect relative's vehicle and recover a used condom, among other things. *Id*. at 399. In determining the admissibility of the evidence gained from that condom, the court had to determine whether the parents had committed a burglary in order to get the used condom. *Id.* at 400. If they had, then the evidence obtained from the condom would be inadmissible, under Article 38.23(a) of the Texas Code of Criminal Procedure, in the trial against Jenschke on charges of sexual assault of a child. *See id.* at 399–400. At issue was the parents' intent when getting into Jenschke's truck to search for and find the condom. *Id.* at 400.

The intermediate appellate court had concluded that "the record shows [the parents'] intent was merely to obtain evidence." *Jenschke v. State*, 116 S.W.3d 173, 176 (Tex. App.—San Antonio 2003), *rev'd & remanded*, 147 S.W.3d 398 (Tex. Crim. App. 2004). The Texas Court of Criminal Appeals disagreed and reversed the court of appeals' decision. *Jenschke*, 147 S.W.3d at 403. It "refined" its previous holdings, on which the San Antonio court had based its decision. *Id.* at 400–01. Addressing the specific issue of whether a person has the requisite intent to deprive when that person enters another person's vehicle without permission to do so in order to obtain evidence to be turned over to police, the court held:

> when a person who is not an officer or an agent of an officer takes property that is evidence of crime, without the effective consent of the owner and with the intent to turn over the property to an officer, the conduct may be non-criminal even though the person has intent to deprive the owner.

*Id*. at 402. Ultimately, the high court concluded that the evidence in the *Jenschke* case was not consistent with the parents' having the intent to turn over the evidence to police, emphasizing that they did not contact authorities until over two years after they obtained the condom. *Id.* at 403. That said, the *Jenschke* court concluded that the parents did commit burglary of a vehicle when they gained unauthorized access to the inside of the truck to get the condom. *Id.* That being said, the condom and the evidence obtained from it should have been excluded under Article 38.23(a) of the Texas Code of Criminal Procedure. *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). *Jenschke*'s discussion of intent to deprive is relevant here, since Brown, too, testified about his intent to turn Walker's gun over to authorities.

Just as in the *Jenschke* case, the evidence in this case would permit the trier of fact to reject Brown's stated intention of turning the obtained evidence over to authorities. The jury learned that Brown lingered for some amount of time on the Walkers' property and that he waved the gun in the air as he taunted and threatened the Walkers. Such conduct, conduct from which the jury could infer intent, is inconsistent with Brown's testimony that he got the gun to turn it over to police. Further, it is undisputed that Brown returned the gun, an act also inconsistent with the intent to turn the gun over to police, especially since Walker had told Brown that he was calling law enforcement authorities to come to the residence. As the assertedly innocent intent in *Jenschke* was inconsistent with the evidence, Brown's stated innocent intent to turn the gun over to police is inconsistent with the evidence. Based on the evidence contrary to Brown's stated intention in getting the gun, the jury

14

could have rejected Brown's testimony in favor of the evidence that suggests that, at the time Brown entered the truck, he acted with the requisite intent to deprive Walker of the gun.

The jury had before it all this evidence, and such evidence was legally sufficient to permit the jury to infer from Brown's words and actions that Brown intended to deprive Walker of the gun. That he later reconsidered the prudence of his actions does not diminish the evidence that he had the requisite intent at the time of the taking.[5] The cumulative force of the evidence supports the jury's verdict when viewed in a light most favorable to that verdict. We conclude that legally sufficient evidence supports the jury's finding on the element of intent and overrule Brown's point of error to the contrary.

---

[5]Brown focuses a great deal of attention on the "intent to deprive." Commission of burglary of a vehicle requires that the individual act with "the intent to commit any felony or theft." *See* TEX. PENAL CODE ANN. § 30.04(a). "Theft" is the unlawful appropriation of property with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 2008). "Deprive" is defined as follows: "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE ANN. § 31.01(2)(A) (Vernon Supp. 2008); *see Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988).

Brown maintains that there is no evidence that he intended to deprive Walker of the gun, that he put the gun right back in the truck. As we have outlined, we conclude that there is. To the extent Brown's contention implicates the position that there was no deprivation, we point out that the State need not prove actual deprivation, only that Brown intended to deprive Walker of the gun. *See Rowland*, 744 S.W.2d at 612. Deprivation is not an element of intent to deprive. *Id.* While evidence of actual deprivation may be evidence of intent to deprive, other evidence may also indicate whether intent to deprive exists. *Id.* Even in cases where there exists no evidence directly indicating an intent to steal property, it has been held that such intent may be inferred from the words, actions, or conduct of the actor. *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989); *Winkley v. State*, 123 S.W.3d 707, 713 (Tex. App.—Austin 2003, no pet.).

15

To support his challenge to the factual sufficiency of the evidence, Brown points to his own testimony to support his contention that he did not intend to deprive Walker of the gun. As we have pointed out, however, his own testimony is inconsistent as far as what Brown did with respect to the gun and for what purpose. Even focusing on the most consistent and most favorable portions of Brown's testimony, we point out that the credibility determination of such evidence is solely within the province of the trier of fact, which was free to accept or reject this defensive evidence. *Thomas*, 919 S.W.2d at 815 (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). After reviewing the evidence, we cannot say that the evidence of intent to deprive is so weak as to be clearly wrong and manifestly unjust. Nor can we conclude that the jury's finding on the element of intent is against the great weight and preponderance of the available evidence. Even though we, had we been sitting as jurors, might have arrived at a different conclusion than the jurors in this case, that potential difference in opinion does not generate the "high level of skepticism about the jury's verdict" which is required before an appellate court may reverse due to factual insufficiency. *Watson*, 204 S.W.3d at 417. We conclude that factually sufficient evidence supports the jury's determination on the element of intent and overrule Brown's point of error to the contrary.

*(4) Conclusion*

Having concluded that legally and factually sufficient evidence supports the jury's verdict, we overrule Brown's points of error and affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice


DISSENTING OPINION

Scott Leroy Brown was charged with the offense of burglary of a vehicle with intent to commit theft.[6] The offense of theft requires proof of an intention to deprive the owner of the property. "Deprive" has a specific and limiting definition: "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." TEX. PENAL CODE ANN. § 31.01(2)(A) (Vernon Supp. 2008). To convict Brown of this offense, it was necessary for the State to prove that Brown intended to deprive Walker of the gun permanently or for an extended period of time, causing a major loss of value or enjoyment of the gun. Even though this definition of intention to deprive is crucial in this case, in analyzing the evidence, the majority opinion discusses "intent" without reference to the requirement

---

[6]The indictment and the jury charge defined "burglary of a vehicle" to include breaking or entering into a vehicle with intent to commit theft or any felony. The State does not argue that any felony other than theft occurred.

17

of a permanent or extended period of deprivation. The proper definition appears only in a footnote at the end of the opinion after the analysis is complete.

As in most instances, there is no direct evidence that Brown had such an intention to deprive, and Brown denies such intent. The issue is whether there is sufficient evidence of other facts to allow a jury to reasonably infer that Brown intended to deprive Walker of the gun permanently or for an extended period. I do not believe there is.

The majority opinion places much emphasis on Brown's inconsistent and unpersuasive explanations for taking the gun. Several pages of the opinion are devoted to Brown's explanations that he took the gun for self-protection or delivery to the police; the opinion finds those explanations unsupportable. However, the issue is not whether Brown's testimony is credible; even if the jury should disbelieve all of his testimony, that rejection does not supply evidence that he had the intent to permanently deprive Walker of the property. The question is what evidence was introduced to allow a jury to infer such intent.

Reliance is placed on Brown's statement that he thought about taking the gun. Undoubtedly he thought about taking the gun—he did in fact temporarily take possession of it. But that does not supply evidence of an intention to deprive the owner permanently—or for an extended period. Brown's statement adds nothing to his actions—he took possession of the gun for a brief period of time. From the first interview, before he knew he was suspected of any offense, Brown has always denied any intention of taking the gun permanently or for an extended period.

The majority opinion then cites Deputy Bell's testimony on the issue of intent. It does not help. First, it is clear that Bell had a misunderstanding as to the intent that was required. When interviewing Brown the evening of this confrontation, he explained that Brown's possession of the gun "technically" constituted burglary of a vehicle. With a tone of incredulity, Brown asked whether just picking up a gun and putting it back down amounted to that offense. Bell responded, "Yeah, you entered the truck." Until he was reminded of the statutory requirements, Bell reiterated at trial that the prerequisite for theft was "removing of property . . . taking possession of the item . . . ." Later, the State, over proper objection, was allowed to ask Bell if "in your mind" Brown's statement that he "thought about taking it" showed "intent on his part" to which Bell answered, "Yes, it does." The majority opinion cites this conclusory, speculative testimony from a witness who did not understand the legal requirement of the offense, apparently as some evidence that Brown took the gun with the intent to permanently or for an extended period deprive the owner. While a deputy sheriff might be excused for generalizing the legal requirements and not properly applying the definition of "deprive" as defined in the statute, we cannot.

The evidence presented was an ongoing dispute between Brown and the Walker family based on domestic problems. It began with one of the parties attempting to scare or bluff the other while driving. Clearly, Brown went to the house of Walker and committed criminal offenses, at least criminal trespass and terroristic threat, which are proper subjects for prosecution. Brown did not take the gun surreptitiously, but instead, the taking occurred in the presence of the owner during a

19

cursing confrontation between Brown and Walker. The gun was used in a threatening and intimidating manner in an apparent effort to frighten the Walkers. While these facts illustrate that Brown committed other crimes and acted deplorably, there is no room for an inference that stealing a gun was Brown's intention.

If this evidence is sufficient to allow a jury to infer Brown intended to deprive Walker of his gun permanently or for an extended period of time, the precedent is established that, if one temporarily takes possession of another's property, that person is guilty of a theft unless he or she can make a reasonable explanation for taking it. That does not meet the statutory requirement for the offense of theft. Brown could have been charged with offenses that he actually committed. The majority does not think Brown presented a persuasive reason for temporarily taking the gun; based on that failure, Brown's nonadmission that he "thought about" taking the gun, and the speculation of a witness who is unfamiliar with the statutory requirements, the majority concludes the State has met its burden to prove that Brown had the intention to take the gun permanently or for an extended period. I believe the evidence is legally insufficient on this issue.

Even if the majority could find some evidence to allow the necessary inference when viewing the evidence most favorable to the State, this evidence would still remain factually insufficient. This evidence is so weak that it will not support the verdict, and the verdict is against the great weight and preponderance of the evidence. Even giving a jury verdict great deference, "a reviewing court's duty,

20

however, does require it to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). In this case, I believe our duty requires us to find this evidence insufficient; I respectfully dissent.


                Jack Carter
                Justice

Date Submitted:     June 25, 2009
Date Decided:       July 31, 2009

Publish