# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00804-CR

**Lapear O'Neal Willrich, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 453RD DISTRICT COURT OF HAYS COUNTY
### NO. CR-19-2213-E, THE HONORABLE SHERRI TIBBE, JUDGE PRESIDING

## O P I N I O N

Lapear O'Neal Willrich appeals his capital murder conviction on, among other grounds, sufficiency and confrontation grounds. We find the evidence sufficient but reverse the conviction for Confrontation Clause error and remand the case for a new trial.[1]

## BACKGROUND

Early in the morning on June 5, 2019, the police were called to The Village of Telluride apartments in San Marcos after a resident—who had tried to return a loose dog, a Husky,

---

[1] Willrich also raises complaints about the trial court's admission of four statements of a party opponent. Because we reverse and remand based on Willrich's confrontation issue, we need not address these remaining issues. *See* Tex. R. App. P. 47.1. In his last issue, Willrich argues, and the State agrees, that the judgment in this case contains a clerical error—a special finding that Willrich waived the right to appeal and was not given permission to appeal. We agree that this portion of the trial court's judgment does not accurately reflect the truth. The trial court certified that this case "is not a plea-bargain case, and the defendant has the right of appeal." Because we reverse the judgment, that special finding does not stand.

to the apartment she thought it had gotten out of—noticed the door to that apartment had been forced open. When the police arrived and entered the two-story, townhouse-like apartment, they found Demarcus Trey Allen dead on the first-stair landing, which was three steps up. A handgun lay to the right of his body; a sawed-off shotgun lay near the apartment entrance. In investigating the crime, the police reviewed the resident's surveillance footage from inside the apartment. The footage captured two masked individuals forcing open the door to the apartment—a heavier man wielding a handgun, and a skinnier man wielding a sawed-off shotgun. Allen, who had been sleeping on an oversized bean-bag chair in the living room, woke up to see the two masked individuals pointing their guns at him, and when the heavier man yelled at him, grabbed him and pulled him up by his shirt, Allen too wielded a handgun. Although the shot sequence is hard to discern from the footage, what is clear is that all three men fired their weapons, and they did so at close range; the skinnier gunman shot Allen in the chest; the heavier gunman shot at him multiple times, including twice after he fell onto the stair landing. The two gunmen, themselves both injured, left him for dead and fled.

The commotion woke up another resident who later told investigators that when he looked out his second-story window, he saw one individual running to the driver's seat of a white "late 80s, early 90s car like a big four door." The car had been backed into a spot directly under his window; he thought there were three individuals total in the car. The car then "sped off pretty fast." Surveillance footage from The Village of Telluride and a nearby business captured a two-tone white Cadillac. Facebook Marketplace tied the Cadillac to Atlantic Johnson—who had reported it as stolen. Two weeks after the murder, Jon Hunter Jervis was arrested in the Cadillac, asleep in the driver's seat, in front of a Motel 6 in Bryan.

Jervis's Facebook account contained photos of gunshot wounds to his back posted shortly after the murder and photos of himself standing by the Cadillac; Jervis was identified through DNA as the skinnier gunman. Jervis led them to Willrich, and after investigators tied him to the crime as the heavier gunman, a grand jury indicted Willrich on capital murder charges.

The jury convicted Willrich, and he received the sentence of automatic life without parole.

### *Sufficiency of the Evidence*

Willrich argues that the State failed to prove his identity as the heavier gunman given the lack of physical evidence; the fact that the testifying accomplice, who had travelled with the men and stayed in the Cadillac during the crime, Chelsy Mistretta, could not identify him and previously identified him as Johnson; the lack of clarity in the surveillance footage from the apartment because the intruders wore masks; and Willrich's "uncontroverted" statement to the police that his phone, which was tied to the crime, had been stolen from him.

### *Applicable Law and Standard of Review*

The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979). In assessing the sufficiency of the evidence to support a criminal conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve

3

conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

*Application*

As charged here, the jury had to find that Willrich committed murder as defined under Subsection 19.02(b)(1) (that is, he intentionally or knowingly caused "the death of an individual"), and that he did so in the course of committing or attempting to commit either burglary of a habitation or robbery. Tex. Penal Code §§ 19.02(b)(1), .03(a)(2). Although no eyewitness testified in court to seeing Willrich shoot Allen or even to seeing him in San Marcos, the State can prove the defendant's identity and culpability by circumstantial evidence, together with all reasonable inferences from that evidence. *See Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

In this case, accomplice Mistretta testified, under an immunity agreement, that she and Jervis had travelled in a two-toned Cadillac from Bryan to Giddings to pick up Jervis's friend, who was neither "big" nor "tiny" nor known to her, on their way to go "hit a lick," meaning to rob someone. The three of them drove in the Cadillac to a specific apartment in San Marcos, one the men had been to before. The men armed themselves—Jervis with a shotgun and his friend with "a handgun like a pistol." Then, wearing "socks over their hands," they kicked in the apartment door. Mistretta testified that she waited in the Cadillac, which had been "backed into a parking spot away from the apartment." A short time later, the men ran back to the Cadillac; both had been shot, and Jervis's friend "was wrapping something around his arm to stop the bleeding." They drove out of San Marcos towards Giddings but ran out of gas. Jervis's friend had a friend

4

pick him up. Mistretta and Jervis hid in a field, where she threw the handgun in a sewer drain at Jervis's direction.

Mistretta stated that some friends later picked them up; they got gas for the Cadillac, left it at a Walmart, and rode with their friends back to Bryan. Mistretta admitted that at the time, she had not been to sleep "in days" because she had been on meth. Though Mistretta had previously identified Jervis's friend as Johnson (the owner of the Cadillac), the jury was shown a photograph of Johnson and could see for itself that Johnson, a thin man, did not fit the physical profile of the heavier gunman in the surveillance video.

Detective Patrick Aubry, who interviewed Willrich, testified that Willrich did fit that physical and vocal profile, as did Adam Nicholas Gonzalez, Jr., who had played football with Willrich in high school. And although Jervis did not testify, the jury saw him. Outside the jury's presence, Jervis was brought into the courtroom and he told the trial court that he would not testify even with a grant of testimonial immunity. The State was then allowed to call Jervis into the courtroom before the jury. Jervis was not asked questions but was asked to stand. The State had Willrich stand up too so the jury could see the two men standing at the same time.

Phone records supported Mistretta's testimony about the travel on that night. Patricia Hon, the crime-intelligence analyst, testified as follows:

Q. So from the dates of June 4th of 2019 to June 5th of 2019, what can you tell from the pattern of Jon Jervis, Chelsy Mistretta, and Lapear Willrich's phones?

A. Prior to the offense we can see that the devices are using cell sites in Giddings, College Station, Bryan. During the time of the offense and the morning of prior to the offense we can see that the devices are starting to use cell sites that are getting closer and closer to San Marcos. Now, after the offense and during the offense we see that they are in the San Marcos area and they—the devices then use cell sites in the Kyle, Niederwald area, and then you see that they separate into two different areas. We see that the devices associated with Mr. Willrich, the phone ending in 5843, appears to be going back towards

5

Giddings. Then you see that the devices associated with Ms. Mistretta and Mr. Jervis are utilizing cell sites along 71 into 21 and then back, and then the days after you see them back in those typical areas that we saw days before the homicide.

Willrich does not quarrel with the evidence of his cell phone's movements. Instead, he argues that the evidence was "uncontroverted" that his cell phone had been stolen from him prior to the offense. But the only evidence of it being stolen came from Willrich and was made during his statement to the police. In that same statement, Willrich initially denied ever hanging out with Jervis, then later gave testimony that, viewed in the light most favorable to the verdict, tied him to the crime scene. Specifically, when interviewed two weeks after the murder, Willrich admitted he knew Jervis as a "dopehead dude that comes around every so often"; said he had not seen him since June 1 or 2 when Jervis was looking for some gas; and the next time he saw him it "was on the news."

He said that Jervis was buying a Cadillac from one of his friends, Johnson. Asked about the wound on his left arm, he said a longhorn had gored him. Officers then told him that they had found his blood in the Cadillac (this was not true); Willrich said he had only been in the Cadillac when Johnson had it, never with Jervis.

Officers then told Willrich that he was under arrest for Capital Murder but that they knew that the fatal shots were fired by the shotgun. When Willrich denied being there, officers told him that "we have blood from the scene that comes back from both of y'all." (This was also not true.) They also told Willrich they knew he had been in San Marcos that night because his phone had been in San Marcos that night. Willrich told officers that he did not have a phone; it had been stolen two or three weeks ago. But he identified his phone number for the officers.

He said he never took his phone to work, and it must have been stolen from his home in Giddings, but he later said that he was not working. Officers also told him, "We know you were there because it is on video. Even though you had your face covered." They said they knew Jervis had fired the shotgun because Jervis had told them that. When they said Jervis had told them that Willrich had asked him to go to San Marcos with him, Willrich said, "Man I didn't ask no one to go nowhere. I just smoke weed. Literally I just smoke weed. That's it." Asked who he knew in the apartment, Willrich said, "Man I didn't know nobody in there." The officers said, "Well somebody told y'all to go to that apartment, to find that person," and Willrich responded, "Somebody said we could get some weed from here, and I was like, that's cool, I need some smoke." He again denied knowing anyone in the apartment, and then the interview ended.

Given the internal inconsistencies in Willrich's statement to the police, it was the jury's prerogative not to credit his assertion that his phone had been stolen and to make the inference that his phone's movement's reflected his own. *See Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("that calls from a person's cellular telephone were made by that person is a natural and permissible assumption for the jury to make"); *Murphy v. State*, 229 S.W.3d 334, 342 (Tex. App.—Amarillo 2006, pet. ref'd) (jury not compelled to believe any specific part of defendant's written statement made to police); *Coleman v. State*, 832 S.W.2d 409, 414 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) ("[A] jury need not attach equal credit to all parts of a confession; it may accept one portion as true and reject the rest."). Giving full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we find the circumstantial evidence sufficient to prove Willrich's identity as the heavier gunman.

*Jackson*, 443 U.S. at 319; *Hooper*, 214 S.W.3d at 13; *Gardner*, 306 S.W.3d at 285. We overrule Willrich's sufficiency complaint.

***Confrontation Violations in Admission of Detective Aubry's Testimony that Accomplice Jervis Named Willrich as a Participant in the Offense and State's Exhibit 38— the Piece of Paper on Which Accomplice Jervis Named Willrich as a Participant in the Offense***

Willrich argues that the trial court ran afoul of the Confrontation Clause by allowing the State to introduce, via Detective Aubry, Jervis's statement naming Willrich as his accomplice.

*Applicable Law and Standard of Review*

In all criminal prosecutions, an accused has the right to be confronted with the witnesses against him. U.S. Const. amend. VI. Therefore, a "testimonial" statement of a witness who does not appear at trial may not be admitted into evidence unless the witness is unavailable to testify, and the defendant has had a prior opportunity to cross-examine that witness. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). But the Clause does not block the use of such statements for purposes other than establishing the truth of the matter asserted. *Id*. at 59 n.9. When a statement is admitted for a reason unconnected to its truth, its role in guarding the right of cross-examination is not implicated. *Smith v. Arizona*, 602 U.S. 779, 785 (2024). "That is because the need to test an absent witness ebbs when her truthfulness is not at issue." *Id*. Even a non-testifying co-defendant's statement can be admitted for a non-hearsay purpose without violating the Confrontation Clause. *Sandoval v. State*, 665 S.W.3d 496, 531 (Tex. Crim. App. 2022). Although evidentiary rulings are generally reviewed for abuse of discretion, we review a constitutional legal ruling de novo. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006).

8

*Application*

The parties agree that Jervis's statement naming Willrich, given to police during a criminal investigation after he had become a suspect, was testimonial in nature. When Willrich objected on confrontation grounds, the State said it was not offering Jervis's identification of Willrich as the heavier gunman "for the truth of the matter asserted" but rather to show how officers started to investigate Willrich.

Before the jury, the prosecutor asked Detective Aubry if Jervis had given him "information related to another outlet in this investigation?" The detective answered, "Yes." "So he wrote down a name on a piece of paper, and he wrote it as Lapear Willrich." The prosecutor presented that sheet of paper to the detective and the exchange continued.

Q. Do you recognize this? Is this the paper that you just told us about?

A. Yes.

Q. At the time that you got this information from Jon Jervis, did you have any idea who the other party of this crime was?

A. I did not.

Q. Okay. Did you know even if the information Jervis was giving you was correct?

A. No.

Q. Was this solely opening up a new line of investigation?

A. Yes.

Q. Okay.

The trial court admitted the handwritten note as State's Exhibit 38 but instructed the jury "that this is an investigative lead and it is not offered for the truth of the matter asserted.

9

It's something that the detectives acted upon." The trial court also included a similar limiting instruction in the jury charge.

The Court of Criminal Appeals has recognized, that "[w]hen the relevance of an out-of-court statement derives solely from the fact that it was made, and not from the content of the assertion it contains, there is no constitutional imperative that the accused be permitted to confront the declarant." *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010). But

> even when a confidential informant's out-of-court statement showing "background" is not *offered* for the truth of the matter asserted, its probative value to place other, more direct evidence in an understandable context will usually be slight compared to its tendency to cause the jury to consider it for that improper, truth-of-the-matter-asserted purpose. And the greater and more damning the detail contained in that out-of-court statement, the greater the likelihood that the jury will gravitate toward the improper use. This is the reason that courts have practiced caution in declaring testimonial out-of-court statements of confidential informants to be admissible as "background" evidence: too much damning information will erode judicial confidence that the accused has truly enjoyed his Sixth Amendment right to confront *all* of "the witnesses against him[.]"

*Id*. at 580. What goes for a non-testifying confidential informant goes for a non-testifying accomplice. In *Langham*, the Court held that "Detective Smith's representation of his confidential informant's statements with respect to the criminal activities at 5301 Encino, and the appellant's 'involvement' in them, provided far greater detail than was reasonably necessary to explain why the police decided to investigate the residence." *Id*. "The bare fact that Smith had obtained unspecified information justifying a search warrant would readily have sufficed to serve this purpose." *Id*. "Under these circumstances, and when the unnecessary details derive from an out-of-court statement that is testimonial, the State cannot justify admitting them over a Confrontation Clause objection with an argument that they are offered merely to supply 'background.'" *Id*. The same is true here. Jervis's identification of Willrich as his accomplice, when identity was hotly

10

contested at trial, was the most damning piece of information put before the jury, creating a greater likelihood that the jury would gravitate toward the improper use. Here, the prosecutor had argued that, "If we don't explain how they started investigating Lapear, we have left this hole in the information and the case law says, yes, we're allowed to explain how the police forward their investigations." But the bare fact that Detective Aubry had obtained unspecified information from an unidentified source that led him to investigate Willrich would readily have sufficed to serve this purpose.

The State argues *Langham* is distinguishable because the State never offered the evidence for a limited purpose. But there, the State did not need to say it offered the testimonial evidence only to show the direction of the investigation because the trial court immediately overruled the confrontation objection.

Here, in declaring the testimonial out-of-court statement of Jervis to be admissible as background evidence, too much damning information eroded judicial confidence that Willrich truly enjoyed his Sixth Amendment right to confront all of the witnesses against him. *See, e.g., United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) ("Under the prosecution's theory, every time a person says to the police 'X committed the crime,' the statement (including all corroborating details) would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers.") (citing *Crawford*).

Under the particular facts of this case, we hold that the admission of Jervis's statement through the testimony of Detective Aubry violated Willrich's right to confront the witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution.

11

Because Confrontation Clause error is of constitutional magnitude, we must reverse the conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). Courts reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt should consider the following factors: 1) how important was the out-of-court statement to the State's case; 2) whether the out-of-court statement was cumulative of other evidence; 3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and 4) the overall strength of the prosecution's case. *Langham*, 305 S.W.3d at 582.

1) **How important was the out-of-court statement to the State's case.**
2) **Whether the out-of-court statement was cumulative of other evidence.**

This statement was crucial to the State's case: it provided the only direct evidence identifying Willrich as the second gunman. And it came from the horse's mouth. Jervis's DNA unequivocally tied him to the scene: "The probability of this profile if the DNA came from Jon Jervis is 18.2 septillion times greater than the probability of this profile if the DNA came from an unrelated, unknown individual." There was no physical evidence or other evidence that any other person positively identified Willrich as the second gunman.

3) **The presence or absence of evidence corroborating or contradicting the out-of-court statement on material points.**

As detailed in the sufficiency review, considerable circumstantial evidence tied Willrich to the crime. But again, the testifying accomplice Chelsey Mistretta contradicted it; Mistretta told the jury that she had told the detectives that she thought the man in the front seat of the car was Atlantic Johnson.

12

**4) The overall strength of the prosecution's case.**

On the one hand, no physical evidence (such as fingerprints or DNA) tied Willrich to the apartment or to the Cadillac. On the other hand, Willrich's phone records and his own statements (viewed in the light most favorable to the verdict) put him at the scene of the crime. His physique matched that of the second gunman.

But "the emphasis of a harm analysis pursuant to Rule 44.2(a) should not be on 'the propriety of the outcome of the trial.'" *Scott v. State*, 227 S.W.3d 670, 690 (Tex. Crim. App. 2007) (quoting *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)). "Instead, the question is the likelihood that the constitutional error was actually a contributing factor in the jury's deliberations in arriving at that verdict—whether, in other words, the error adversely affected 'the integrity of the process leading to the conviction.'" *Id.* Here, the defensive theory throughout trial was that the State had failed to prove and could not prove Willrich's identity as the second gunman. Courts, including this one, have repeatedly recognized the unique persuasiveness of an accomplice's out-of-court statement naming the defendant as a participant in the crime. *See Mendez v. State*, 56 S.W.3d 880, 893 (Tex. App.—Austin 2001, pet. ref'd) ("Flores's confession unequivocally identified appellant as the primary actor and, although presumptively unreliable, was clearly the most persuasive evidence of appellant's guilt presented to a lay jury. Therefore, we conclude that the introduction of Flores's confession was harmful to appellant and requires reversal."); *Brooks v. State*, 132 S.W.3d 702, 711 (Tex. App.—Dallas 2004, pet. ref'd) ("[U]nchallenged direct evidence provided by a criminal cohort is 'clearly' more persuasive to a jury than challenged circumstantial evidence.").

We hold there is a reasonable possibility that the *Crawford* error moved the jury from a state of non-persuasion to one of persuasion on the issue of identity. After our own review

13

of the record, we cannot declare, to a level of confidence beyond a reasonable doubt, "that the error did not contribute to the conviction" and therefore cannot affirm the conviction. *See Scott*, 227 S.W.3d at 690-91.

## CONCLUSION

Having sustained Willrich's Confrontation Clause issue, we reverse the trial court's judgment and remand the case to the trial court for a new trial.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Reversed and Remanded

Filed:   November 14, 2025

Publish

14